THE HOUSING AUTHORITY OF THE CITY OF DALLAS ET AL V. WILL HIGGINBOTHAM ET AL.

No. 7675. Decided June 26, 1940.
(143 S. W., 2d Series, 79.)

*H. P. Kucera* and *Scurry & Scurry,* all of Dallas, for appellants.

The use of the property which the housing authority had been given the right to condemn was for a public purpose, and an injunction should not lie to prevent said authority for condemning said property for that purpose. Bland v. City of Taylor, 37 S. W. (2d) 291; Malloy v. Galveston County, 42 S. W. (2d) 163; City of Abilene v. State, 113 S. W. (2d) 631.

The right of condemnation does not require that housing project shall be situated only in a slum area. Bobbitt v. Gordon, 108 S. W. (2d) 234; Crary v. Port Arthur Channel & Dock Co., 92 Texas 275, 47 S. W. 967; Crossman v. City of Galveston, 112 Texas 303, 247 S. W. 810.

Delegation of power to housing authority did not violate constitutional provisions. Brazos Conservation Dist. v. McCraw, 126 Texas 506, 91 S. W. (2d) 665; Lombardo v. City of Dallas, 124 Texas 1, 73 S. W. (2d) 475; Berry v. City of Ft. Worth, 132 Texas 599, 124 S. W. (2d) 842; 6 R. C. L. 180.

Such property being for public use is exempt from taxation. Corporation of San Felipe de Austin v. State, 111 Texas 108, 229 S. W. 845; Lower Colorado River Authority v. McCraw, 132 Texas 599, 124 S. W. (2d) 842, 6 R. C. L. 180.

*Joe A. Worsham, Allen Wight, E. A. Belsterling* and *Irion Worsham,* all of Dallas, for appellees.

The housing authority under which the City of Dallas attempts to take plaintiffs' property is null and void in that said property was not being taken for a public purpose; the object in taking said property was to appropriate its use for a special privilege not in consideration of a public service; it was a delegation of power to fix rates and condition to a commission other than those named in the Constitution; it was not slum property, and it was the exemption of property from taxation which was not for a public use. Borden v. Trespalacios Rice & Irr. Co., 98 Texas 494, 86 S. W. 11; Fitzgerald v. City of Dallas, 34 S. W. (2d) 682; Howard v. Henderson County, 116 S. W. (2d) 479; St. Edwards College v. Morris, 17 S. W. 512; Todd v. Massey, 30 S. W. (2d) 532; Webster v. Heard, 32 Texas 685.

*Samuels, Foster, Brown & McGee,* of Dallas, filed briefs as amicus curiae, on behalf of a number of housing authorities throughout the State of Texas.

MR. JUDGE SLATTON, of the Commission of Appeals, delivered the opinion for the Court.

The Housing Authority of the City of Dallas instituted proceedings under the general condemnation statutes in the county court at law at Dallas County seeking to condemn property belonging to Will Higginbotham for the establishment, construction and operation of a low rent housing project. The Authority had instituted other similar proceedings and contemplated such action against other adverse parties herein. Higginbotham and the other parties similarly situated made application to the district court of Dallas County for injunction on the grounds that the housing law was unconstitutional. The parties, through stipulation of facts and evidence, submitted the application for temporary injunction to the court and a temporary injunction was issued against the Housing Authority in conformity with the prayer of the petitioners. The Authority appealed to the Court of Civil Appeals at Dallas. That court certified the constitutional questions to this court. We quote the following important portions of the certificate of the Honorable Court of Civil Appeals:

"The Texas Housing Authorities Law, Art. 1269 K, generally under attack, is lengthy, and pertinent features thereof need only be referred to by section and paragraph, except as to Sec. 2 (the Legislature's finding and declaration of necessity), which we quote: '(a) That there exists in the State insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the State there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy overcrowded dwelling accommodations; that the aforesaid conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals, and welfare of the residents of the state and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; (b) that these slum areas cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income (as herein defined) would therefore not be competitive with private enterprise; (c) that the clearance, re

planning, and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of State concern; that it is in the public interest that work on such projects be commenced as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provisions hereinafter enacted; is hereby declared as a matter of legislative determination.'

"It is primarily the contention of Appellees (Plaintiffs in injunction) that, considering the purpose of the whole act, it authorizes a taking of their property not exclusively for a public use, under the Texas decisions and Constitution, with especial reference to the limitations of Art. 1, Sec. 17; that, if valid at all, the primary purpose of the Act is slum clearance; that the proceedings brought and to be brought by Appellant nowhere declare the existence of a purpose to clear any slums, but, on the other hand, the direct object of the present proceedings is the taking of private property by the power of eminent domain, for a low-cost housing project, independent of slum clearance; it being stipulated that the property sought is not in a slum area and the residences situated therein, not substandard, as defined in the law. Appellant asserts the entire validity of the State Housing Law, and that all proceedings to condemn thereunder are likewise valid.

### 1.

"Since private property cannot be taken under the power of eminent domain unless it be for a public use; and bearing in mind the purpose and terms of the whole Act, is Sec. 12 thereof (conferring upon the Housing Authority the power of eminent domain) valid against the objection that it violates either of the following provisions of the State Constitution: of Art. 1, Sec. 3, prohibiting special privileges to individuals not in consideration of public service; of Art. 1, Sec. 17, limiting the taking of property to a public use; or, Art. 3, Secs. 52, 53, denying the grant of public money or thing of value to individuals without constitutional authority; or Art. 2, Sec. 1, invalid delegation of legislative power; or Secs. 1 and 2, Art. 8, concerning equal and uniform taxation?

### 2.

"Does the use for which appellant Authority seeks to ac-

quire the property in question through the condemnation proceedings herein, constitute a public use within the meaning of Art. 1, Sec. 17 of the Constitution?

### 3.

"The pleadings of the Plaintiff allege that the Housing Authority has instituted several condemnation proceedings against the various Plaintiffs and that the Housing Authority in its condemnation petition has not alleged that the individual pieces of property sought to be condemned were located in a slum area, such as described under Section 3, Subdivision H, of the Act, or that said properties and homes are being condemned for the purpose of cleaning, replanning and reconstructing an area in which insanitary or unsafe housing conditions exist, for which reasons such condemnation proceedings are invalid. Is the determination of the Housing Authority of the necessity for the taking, acting within the scope of the Housing Act, and particularly Section 12, conclusive upon the Court, or is it a question of fact to be determined in each particular case involving a piece of property sought to be taken?

The Seventy-fifth Congress of the United States passed what is known as the United States Housing Act, Title 42, U. S. C. A., Sec. 1401, which was approved September 1, 1937. In that act the Congress declared it to be the public policy of the United States to promote the general welfare by employing its funds to assist the several states to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe and sanitary dwelling for families of low income that are injurious to the health, safety and morals of the citizens of the nation. The Housing Authorities Law in Texas was passed by the Legislature in 1937 at its second called session and was approved on November 3, 1937, and in addition to the Legislature's finding and a declaration of necessity as quoted in the certificate it defined a housing project as meaning any work or undertaking "(1) To demolish, clear or remove buildings from any slum area. Such work or undertaking may embrace the adaption of such area to public purposes, including parks or other recreational or community purposes, or (2) to provide decent, safe and sanitary urban or rural dwellings, apartments or other living accommodations for persons of low income; such work or undertaking may include buildings, land, equipment, facilities and other real or personal property for necessary, convenient, or desirable appurtenances, streets, sewers, water service, parks, site preparation, gardening, ad-

ministrative, community, health, recreational, educational, welfare or other purposes, or (3) to accomplish a combination of the foregoing. The term 'housing project' also may be applied to the planning of the buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration and repair of the improvements and all other work in connection therewith."

"Persons of low income" is defined as meaning families or persons who lack the amount of income which is necessary, (as determined by the authority undertaking the housing project) to enable them without financial assistance to live in decent, safe and sanitary dwellings without overcrowding.

Section 8 of the act, defining the powers of an authority, provides that an authority shall constitute a public body, corporate and politic, exercising public and essential governmental functions.

Section 9 provides that an authority shall operate its housing projects in such a manner as to enable it to fix the rentals at the lowest possible rates consistent with its providing decent, safe and sanitary dwelling accommodations and that no authority shall construct or operate any such project for profit or as a source of revenue to the city.

Section 10 of the act provides that such dwelling accommodations shall be rented only to persons of low income and shall be at rentals within the financial reach of such persons and that no person shall be accepted as a tenant if the person or persons who would occupy the dwelling accommodations have an aggregate annunal income in excess of five times the annual rental to be charged, except that in certain specified cases the ratio shall not exceed six times the rental.

Section 12 of the act grants to an authority the right to acquire by the exercise of the power of eminent domain any real property which it may deem necessary for its purpose under the act.

Section 21 authorizes the authority to seek the financial aid of the Federal government in the construction, maintenance and operation of its housing project. A reading of both the Federal and Texas acts demonstrates that the purposes sought are the elimination of slum conditions and the providing of safe and sanitary dwelling accommodations for persons of low income. Therefore, the most important question presented is whether this is a public use or purpose for which a housing

authority may be granted the right to exercise the power of eminent domain.

■ The question of what is a public use is a question for the determination of the courts; however, where the Legislature has declared a certain thing to be for a public use, such declaration of the Legislature must be given weight by the courts. In the case of West v. Whitehead, 238 S. W. 976 (writ of error refused) the court says:

"Where the Legislature declares a particular use to be public use the presumption is in favor of this declaration, and will be binding upon the courts unless such use is clearly and palpably of a private character."

The United States Supreme Court, speaking through Mr. Justice Holmes, in Block v. Hirsch, 256 U. S. 135, lays down the rule as follows:

"No doubt it is true that a legislative declaration of facts that are material only as the ground for enacting a rule or law, as for instance that a certain use is a public one, may not be held conclusive by the courts * * * but a declaration by a legislature concerning public conditions that by necessity and duty it must know is entitled at least to great respect."

The question as to whether slum clearance and low rent housing are public uses and purposes is a new question in this jurisdiction. The question has been presented to the courts of last resort in the following jurisdictions and has been determined without exception to be a public use: New York City Housing Authority v. Muller, 270 N. Y. 333, 1 N. E. (2d) 153; Opinion of the Justices, 235 Ala. 485, 179 So. 535; Marvin v. Housing Authority of Jacksonville, 133 Fla. 590, 183 So. 145; Williamson v. Housing Authority of Augusta, 186 Ga. 673, 199 S. E. 43; Krause v. Peoria Housing Authority , 370 Ill. 356; Edwards v. Housing Authority of the City of Muncie, (Supreme Court of Indiana) 19 N. E. (2d) 741; Spahn v. Stewart, 268 Ky. 97, 103 S. W. (2d) 651; Porterie v. New Orleans Housing Authority, 190 La. 710, 182 So. 725; Rutherford v. City of Great Falls, 107 Mont. 512, 86 Pac. (2d) 656; Housing Authority of the County of Los Angeles v. Dockweiler 14 Calif. (2d) 437, 94 Pac. (2d) 794; Wells v. Housing Authority of Wilmington, 213 N. C. 744, 197 S. E. 693; Dornan v. Philadelphia Housing Authority, 331 Pa. St. 209, 200 Atl. 834; McNulty v. Owens, 188 S. C. 377, 199 S. E. 425; Knoxville Housing Authority v. City of Knoxville, 174 Tenn. 76, 123 S. W. (2d) 1085; Chapman v. Huntington, West Virginia Housing

Authority (Supreme Court of W. Va.) 3 S. E. (2d) 502; Allydon Realty Corporation et al v. Holyoke Housing Authority et al 23 N. E. (2d) 665; Stockus et al v. Boston Housing Authority (Mass.) 24 N. E. 33; In the Matter of the City of Detroit, a Municipal Corporation for the Acquiring of Land for the Brewster County Housing Site (Supreme Court of Michigan) 291 Mich. 313, 289 N. W. 493; Laret Investment Co., a corporation, v. Bernard F. Dickmann, Mayor of the City of St. Louis, Mo. et al (Supreme Court of Missouri En Banc) 134 S. W. (2d) 65; Pasquale Romano et al, Prosecutors, v. Housing Authority of the City of Newark, et al 123 N. J. L. 428, 10 Atl. (2d) 181.

The Constitution of Texas, Article 1, Section 17, provides:

"No person's property shall be taken, damaged, or destroyed for, or applied to, public use without adequate compensation being made, unless by the consent of such person; and when taken, except for use of the state, such compensation shall be first made, or secured by a deposit of money."

The question of what is public use is a question for the courts, as was stated in the case of Dallas Cotton Mills v. Industrial Corporation, 296 S. W. 503:

"A sine qua non of lawful taking, destruction, or damaging of property for or on account of public use must be a public one in truth. Mere fiat, whether pronounced by the Legislature or by a subordinate agency, does not make that a public use which is not such in fact, and the question (always present) as to the true nature of the use is one of law."

No broad rule has been laid down in determining public use, but each case has been determined upon its own facts and the surrounding circumstances. The Supreme Court, in the case of Davis et al v. The City of Taylor et al, 67 S. W. (2d) 1033, held valid a city ordinance appropriating funds for the Board of City Development, whose duties and purposes should be devoted to the growth, advertisement, development and increase of the taxable values of the city.

The constitutionality of the act in question has been attacked on the ground that such low rent housing project will not be available to the public generally but only to persons of low income. The question of whether or not in a given case the use is a public one depends upon the character and not the extent of such use. West v. Whitehead, supra. In that case it is said:

"It depends upon the extent of the right the public has to such use, and not upon the extent to which the public may

exercise that right. It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it. The mere fact that the advantage of the use enures to a particular individual or enterprise, or group thereof, will not deprive it of its public character. Nor does the public use, if a railroad, depend upon its length, nor whether it is only a branch road, nor that its equipment is to be furnished by another corporation, nor that its stockholders are also stockholders in a corporation which will be primarily benefited by its construction. If a railroad invoking the power of eminent domain is to be a highway, or a common carrier, and open to the promiscuous and uniform use of the public, such facts conclusively make it a public use, and the extent of the public need and probable use thereof is not a question for the courts, and may not be inquired into; * * *. The Legislature, in its discretion, has conclusively determined that a public necessity exists for the exercise of the power of eminent domain to accomplish the purposes of the act in question, and has lawfully delegated that power to a railroad corporation, which is under the law a public highway and a common carrier, and which, shorn of the power to discriminate, is open to the use of the public at large. These facts exist as a matter of law, and conclusively constitute the use of the property to be taken as a public use."

This court upheld the validity of a tax levied by the city for the purpose of establishing and maintaining a municipal band. Goodnight et al v. City of Wellington, 118 Texas 207, 13 S. W. (2d) 353.

We have cited the above Texas cases to illustrate the trend of the decisions in this jurisdiction in the determination of what is a public use.

A review of the cited cases from our jurisdiction demonstrates that this court has adopted a liberal view concerning what is or is not a public use. However, as shown from the expression contained in the case of Borden v. Trespalacios Rice and Irrigation Company, 98 Texas 494, 86 S. W. 11, "This court is not inclined to accept that liberal definition of the phrase 'public use' adopted by some authorities which makes it mean no more than the public welfare or good, and under which almost any kind of exclusive business which promotes the prosperity and comfort of the country might be aided by the power of eminent domain." It was decided in that

case that the appropriation of water by an irrigation district was a public use, even though the district only served those living within the district and not all of the public, notwithstanding the fact that certain ones of those living in the district to whom the water would be available might be postponed to those with whom contracts were already made. The public use arose out of the general benefit to the State through the reclamation of arid lands for agriculture by irrigation, which would otherwise be lost to the State.

The declaration of the Legislature in the instant enactment, as all authorities agree, is entitled to great weight. Can we say that such conditions do not exist? Can we say as a matter of law that insanitary or unsafe dwelling accommodations or overcrowding in such dwellings do not cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the State? Common knowledge aids prima facie findings of the Legislature and we are unable to say as a matter of law that such findings are manifestly wrong.

The power of eminent domain has been validly exercised in this State by (a) corporation may exercise the power in the maintenance and operation of drainage ditches, canals and flumes, Article 1302, R. C. S. 1925, Sec. 31; (b) cities may exercise the power to open or widen a street, to construct water mains, supply reservoirs, sewers, to establish hospitals or pest houses, to construct, maintain and operate municipal airports, Art. 1107, R. C. S. 1925; (c) a corporation chartered for the purpose of constructing water works or furnishing water supplies to a city or town may exercise the power to acquire the private property necessary for the construction of supply reservoirs, or standard pipes for water works, Art. 1433, R. C. S. 1925; (d) gas companies, electric light and power companies are given the power to condemn lands, right-of-way easements and property to erect their lines, Art. 1436, R. C. S. 1925; (e) pipe line companies may condemn for the purpose of laying their lines for the transportation of oil, gas, salt, brine, etc., Arts. 1495-1497, R. C. S. 1925; (f) a toll road corporation is given the power for the purpose of securing the right-of-way for its road, Art. 1463, R. C. S. 1925. The Legislature has conferred the power of eminent domain in many other instances, but the above are the ones which have been held to have been validly conferred. The power of eminent domain has been held to have been validly conferred because the purposes were affected with a public interest.

■ We are thoroughly convinced that the use to which the

housing project will be devoted is a public one. Therefore it follows that the grant in the law of the power of eminent·domain does not violate Article 1, Section 17, of the Constitution of Texas.

■ The next inquiry as disclosed by the certificate is the contention that the act violates Article 1, Section 3, of the Constitution of Texas. Section 3 is as follows:

"All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."

The cases cited above from other jurisdictions having similar provisions in their constitutions as we have in ours overrule this attack. The primary purpose of the Housing Authorities Law is to eliminate slums, from which the entire community derives a benefit through the elimination of conditions giving rise to crime and disease. As the state at large derives a benefit from the reclamation of arid lands through irrigation, so will the state at large derive a benefit through the elimination of conditions giving rise to crime and disease.

The Legislature in the instant law under attack has made no attempt to grant special privileges to any man or set of men, but has made a reasonable classification of the members of the public and has provided that such low rent dwelling accommodations shall be available to all members of the public who presently or in the future fall within the classification made by the Legislature. Such class legislation has been uniformly upheld in this State, provided there is any reasonable basis which would justify the classification. Clark v. Finley, 93 Texas 171, 54 S. W. 343; Union Central Life Insurance Company v. Chowning, 86 Texas 654, 26 S. W. 982; Hurt v. Cooper, 130 Texas 433, 110 S. W. (2d) 896 (chain store tax).

It necessarily follows from the above holding that the law is not violative of Sections 52 and 53 of Article 3 of the Constitution which deny the authority of the Legislature to grant public money or thing of value to individuals without constitutional authority.

■ Our next inquiry is the contention that the law is violative of Section 1 of Article 2 of the Constitution. Section 1 is as follows:

"The powers of the government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to-wit: Those

which are legislative to one; those which are executive to another, and those which are judicial to another; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

An examination of the Housing Authorities Law will show that in connection with the duties devolving upon the housing authority certain definitions are given and certain standards laid down for the guidance of the authority in the exercise of its powers and the performance of its duties.

For instance, "slum" is defined as an area where dwellings predominate which by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities or any combination of these factors are detrimental to safety, health and morals. Sec. 3(h).

"Persons of low income" are defined as families or persons who lack the amount of income which is necessary (as determined by the authority) to enable them without financial assistance to live in decent, safe and sanitary dwellings without overcrowding. Sec. 3(j).

The governing body of the city, in determining whether dwelling accommodations are unsafe or insanitary, may take into consideration the degree of overcrowding, the percentage of land coverage, the light, air space and access available to the inhabitants of such accommodations, the size and arrangement of the rooms, the sanitary facilities and the extent to which such conditions exist in such buildings which endanger life or property by fire or other causes. Sec. 4.

Section 9 provides that the authority shall fix rentals at no higher rates than it shall find to be necessary in order to produce revenues which (together with all other available moneys, revenues, income and receipts of the authority from whatever source derived) will be sufficient, (a) to pay as the same may become due the principal and interest on the bonds of the authority; (b) to meet the cost of and to provide for the maintaining and operating of the projects (including cost of insurance) and administration expenses; and (c) to create during not less than six years immediately succeeding its issuance of bonds a reserve sufficient to meet the largest principal and interest payments which will be due on such bonds in any one year thereafter.

Section 10 provides that with respect to rentals and tenant selection the authority may rent dwelling accommodations only to persons of low income and at rentals within the financial

reach of such persons and that it may rent to a tenant dwelling accommodations consisting of the number of rooms (but no greater number) which is deemed necessary to provide safe and sanitary accommodations to the proposed occupants without overcrowding, and that it shall not accept any person as a tenant if the person or persons who would occupy the dwelling have an aggregate annual income in excess of five times the annual rental, except that in case of families with three or more minor dependents such ratio shall not exceed six to one. It is further provided that in computing the rent for the purpose of tenant selection there shall be included in the rental the average rental cost to the occupants of heating, water, electricity, gas, cooking range and other necessary services or facilities whether or not the charge for such services and fees is in fact included in the rental.

Section 13 provides that all housing projects shall be subject to the planning, zoning, sanitary and building laws, ordinances and regulations applicable to the locality in which the housing project is situated and that in the planning and location of such a project the authority shall take into consideration the relationship of the project to any larger plan or long range program for the development of the area in which the authority functions.

Considering the broad policy and purpose of the Housing Authorities Law and taking into consideration the varying conditions throughout the State to which the law must apply, we conclude that the Legislature has furnished a sufficient guide for the housing authority. Our decisions from our own jurisdiction which deal with the subject under consideration may be divided in the following classifications:

(1) Where the Legislature because of the nature of the subject of legislation cannot practically and efficiently exercise such powers, the power given to the Railroad Commission to fix rail rates, to determine questions of public convenience and necessity relating to the granting of permits of trucks to operate over the highway or related to permission granted to drill oil wells. Trimmier v. Carlton, 116 Texas 572, 296 S. W. 1070; Kinney v. Zimpleman, 36 Texas 554.

(2) It is not an invalid delegation of legislative authority to grant to an administrative body the right to make rules to put into effect completed laws (the authority granted to the Sanitary Commission to fix quarantine lines), Smith v. The State, 74 Texas Criminal Reports, 232, 168 S. W. 522; Serres v. Hammond, 214 S. W. 596; Moody v. Jones, 9 S. W. (2d) 446.

(3) The Legislature may validly delegate the authority to find facts from the basis of which there is determined the applicability of the law; that is, an administrative body may be given the authority to ascertain conditions upon which an existing law may operate (the authority given railroad commissions, public utility commissions, livestock and sanitary commissions, public health boards and fish and game commissions). Tuttle v. Wood, 35 S. W. (2d) 1061; State v. St. Louis, Southwestern Railroad, 165 S. W. 491; City of San Antonio v. Zogheib, (Com. App.) 101 S. W. (2d) 539; Brazos River Conservation & Reclamation District v. McCraw, 126 Texas 506, 91 S. W. (2d) 665.

(4) In the delegation of legislative authority the Legislature must set up standards, leaving to selected municipalities the making of those rules and the determination of facts to which legislative policy is to apply. Such standards may be broad where conditions must be considered which cannot be conveniently investigated by the Legislature. (Illustrative of this is the zoning law.) Lombardo v. City of Dallas, 124 Texas 1, 73 S. W. (2d) 475.

(5) The power to fix rates within prescribed limits to cover specified items of cost may be delegated. Lower Colorado River Authority v. McCraw, 125 Texas 268, 83 S. W. (2d) 629, 637; Burgess v. American Rio Grande Land & Irrigation Company, 295 S. W. 649.

(6) The power to determine the question of necessity to take particular land for public use under eminent domain may be validly delegated. Crary v. Port Arthur Channel and Dock Company, 92 Texas 275, 47 S. W. 967.

The problem seems to be in each case to apply the foregoing principles to the facts of the particular case and to determine whether or not invalid delegation of legislative authority has been made. Applying the principles announced in the cases cited, we are of the opinion that the housing law under attack is not violative of Section 1 of Article 2 of the Constitution of Texas. Moreover, like attacks have been made in other jurisdictions and in each instance overruled. Spahn v. Stewart, (Ky.) supra; Wells v. Housing Authority of the City of Wilmington (N. C.) supra; Dornan v. Philadelphia Housing Authority (Pa. St.) supra; Chapman v. Huntington, West Virginia Housing Authority (W. Va.) supra; Williamson v. Housing Authority of Augusta, (Ga.) supra; Krause v. Peoria Housing Authority (Ill.) supra; Porterie v. New Orleans Housing Authority (La.) supra; Knoxville Housing Authority v.

Knoxville (Tenn.) supra; Rutherford v. City of Great Falls, (Mont.) supra.

■ Our next consideration will be devoted to the contention that the act is violative of Sections 1 and 2 of Article 8 of the Constitution concerning equal and uniform taxation.

In addition to the legislative declaration that the clearance of slums and construction of low rent dwelling accommodations are public uses, the act provides that an authority shall constitute a public body corporate and politic, exercising public and govermental purposes and that no housing authority shall construct and operate any such project for profit or as a source of revenue to the city. The act further provides:

"The property of an authority is declared to be public property used for essential public and governmental purposes and such property and an authority shall be exempt from all taxes and special assessments of the city, the State or any political subdivision thereof."

That the act does not violate these sections of the Constitution is well demonstrated by the case of San Felipe de Austin v. State, 111 Texas 108, 229 S. W. 845. That the property belonging to a housing authority may be properly exempt under Section 2 of Article 8 of the Constitution is illustrated in the case of Bexar-Medina-Atascosa Counties Water Improvement District No. 1 v. The State, 21 S. W. (2d) 747. Similar attacks were made upon the Housing Authorities Laws in other states in which the law has been upheld and in each instance the attack has failed. See the cases from the Supreme Courts of the following states: Florida, Montana, Pennsylvania, West Virginia, Georgia and others.

■ It is next contended that the condemnation proceedings of the Housing Authority were invalid because no allegations were made that the property sought to be condemned was situated in a slum area as defined under Section 3, Subdivision 8, of the act. These contentions are presented in the third question, above quoted, of the certificate. Section 12 of the Housing Authorities Law provides that: "The Authority shall have the right to acquire by the exercise of the power of eminent domain any real property which it may deem necessary for its purpose." The law is well established in this State that where the power of eminent domain is granted, a determination by the condemnor of the necessity for acquiring certain property is conclusive in the absence of fraud. The rule is well stated in the case of West v. Whitehead, supra. In cases where

the act of the Legislature has apparently restricted the right to condemn to cases of necessity the courts have construed the grant of the power to mean that the condemnor may condemn such property as it deems necessary for its purposes. Crary v. Port Arthur Channel and Dock Company, supra. In the case of Joyce v. Texas Power & Light Company, 298 S. W. 627, it is said:

"In delegating the power of eminent domain the Legislature, in article 3264, evidently intended to prescribe what facts must be set out in the statement in writing, and determined for itself every question as to necessity and public use, and left only to the courts, and the procedure prescribed, the determination of the amount to be paid in order to acquire the right to the use of the property. The rule seems to be that only where the Consitution or the Legislative act limits the right to take private property to cases of necessity, that the question of necessity becomes an issue to be pleaded or proved. In such cases the issue of necessity for the taking becomes so by reason of express provision by law. In such case the question of necessity becomes a judicial one. * * * * *

"In Mangen v. Texas Transportation Co., 18 Tex. Civ. App. 478, 44 S. W. 998, Judge Neill quotes from 2 Dillon, Mun. Cor. (4th Ed.) Sec. 600, as follows:

" 'Of the necessity or expediency of exercising the right of eminent domain in the appropriation of private property to public uses, or the corporate body or tribunal upon which it has conferred the power to determine the question, is conclusive upon the courts, since such a question is essentially political in its nature and not judicial.'

"For other cases we have reviewed, without quoting therefrom at length, see: Borden v. Irrigation Co., 98 Tex. 494, 86 S. W. 11, Croley v. Ry. Co. (Tex. Civ. App.) 56 S. W. 615; Boom Co. v. Patterson, 98 U. S. 403, 35 L. Ed. 206; Palmer v. Harris County, 29 Tex. Civ. App. 340, 69 S. W. 229, in which the court held that the trial court correctly refused to submit to the jury the question of the necessity of taking the land; Cane Belt Ry. Co. v. Hughes, 31 Tex. Civ. App. 565, 72 S. W. 1020, in which the reason for the rule stated is discussed; Imperial Irrigation Company v. Jayne, 104 Tex. 395, 138 S. W. 575; Ann. Cas. 1914B, 322, in which it is said:

" 'When the use is public, the necessity or expediency of appropriating any particular property is not a subject of judicial cognizance'."

The reason for the rule seems to be that:

"If different courts and juries were allowed to pass on the necessity or advisability of condemning each tract out of the many which go to make up a right-of-way for a railway line, straight courses from point to point, with the consequent lessening of mileage, would in many, if not all, cases be impossible to secure. So in the case of depot grounds. One jury might hold, on competent evidence, that the land in question was not necessary to the purpose of the railroad. Another might render a like verdict as to any other tract sought to be subjected to its uses, and by such a course the company could be excluded altogether." Cane Belt Railway Co. v. Hughes, 72 S. W. 1020.

To the same effect are Tarrant County v. Shannon, 127 Texas 264, 104 S. W. (2d) 4; McInnis v. Brown County Water Improvement District, 41 S. W. (2d) 741; Bobbitt v. Gordon, 108 S. W. (2d) 234.

■ But it is argued by the property owner that the Housing Authorities Law has not declared the construction and maintenance of a low rent housing project a public use and therefore the Legislature has not the authority to grant the Authority the power of eminent domain. Stated in another way, it is argued that the Housing Authority cannot condemn property unless such property is in a slum area. Under Section 2 of the law, paragraph (c) it is declared that "The clearance, replanning and reconstruction of the area in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern." The Legislature did not say that the clearance of a slum and construction of a low rent housing project is a public use and purpose, nor did the Legislature say that slum clearance and a low rent housing project in the same place is a public use and purpose. It is apparent from the act that the Legislature intended to include both slum clearance and the providing of safe and sanitary dwelling accommodations for persons of low income to be public uses. The definition of a housing project, Section 3(i) shall mean any work or undertaking (1) to demolish, clear or remove buildings from any slum area. Such work or undertaking may embrace the adoption of such area to public purposes, including parks or other recreational or community purposes, or (2) to provide decent, safe and sanitary urban or rural dwellings, apartments, or other living accommodations for persons of low income. Such

work or undertaking may include buildings, land, equipment, facilities and other real or personal property for necessary, convenient or desirable appurtenances, streets, sewers, water service, parks, site preparation, gardening, administrative, community, health, recreational, educational welfare or other purposes or (3) to accomplish a combination of the foregoing. The term "housing project" also may be applied to the planning of the buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration and repair of the improvements and all other work in connection therewith. Such a definition includes either slum clearance or the construction of low rent housing or a combination of such two functions. The power of eminent domain was conferred on an authority in the following language:

"An authority shall have the right to acquire by the exercise of the power of eminent domain any real property which it may deem necessary for its purposes under this act, after the adoption by it of a resolution declaring that the acquisition of the real property described therein is necessary for such purpose."

Thus the Legislature does not limit the exercise of the power to property situated in a slum area. A slum area is defined in the Housing Authorities Law under Section 3(h) as follows:

" 'Slum' shall mean any area where dwellings predominate which by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities or any combination of these factors are detrimental to safety, health and morals."

Under Section 8 of the act, which defines certain powers of the Authority, there is included in paragraph (f), which relates to the duty of the authority to make study and investigation into houses and living conditions and into the methods and means of improving such conditions. In connection with the study the Authority is empowered to determine where slum areas exist or where there is a shortage of decent, safe and sanitary dwelling accommodations for persons of low income, and to make recommendations and cooperate with the city, county and state in clearing up such conditions.

It is our construction of the act that the Authority may construct a housing project in an area not found to be a slum area. The reasons, in addition to the construction of the statute, are fully demonstrated in the case of Chapman v. Huntington, West Virginia Housing Authority, supra. In that case it is said:

"As a third proposition plaintiff urges that the proposed development is unauthorized by the West Virginia statute because (a) the statute does not authorize housing projects apart from slum clearance and (b) the proposed development is not based upon proper investigation with opportunity to interested citizens to be heard. True, the act does not authorize housing projects apart from slum clearance. If it did, there would indeed be grave doubts as to its constitutionality.

"The amended bill in the instant case, however, does not disclose that the housing projects are made without regard to slum clearance. Its allegations to that effect, as we have seen, are based upon the unsound proposition that the housing project must be built on the same ground where the slum clearance is made. Nothing in the United States Housing Authorities Law or the West Virginia statute would indicate this requirement. Such requirement, as indicated, would hardly be reasonable, because, as suggested before, slums may be located in sections of a city where it would not be feasible or proper to erect such projects."

We conclude, therefore, that it is not necessary for the property sought to be condemned to be situated within a slum area.

We are of the opinion that the law is not violative of the constitutional provisions which have been urged against it. Our discussion discloses the answers which we think should be made to the questions propounded to us by the Court of Civil Appeals. Hence, we shall not restate them.

The writer is indebted to the late Chief Justice Cureton for the use of copious notes made by him while he retained the case until his untimely passing. The notes do not disclose that a conclusion had been reached, but are rich in historical and legal research and have been of great benefit to the writer.

Opinion adopted by the Supreme Court June 26, 1940.