**WESTERN SEAFOOD COMPANY,**
**Plaintiff,**

v.

**The CITY OF FREEPORT, Texas, and Freeport Economic Development Corporation, Defendants.**

No. CIV.A. G–03–811.

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 5, 2004.

Randell A. Kocurek, Kocurek & Associates, Houston, TX, for Plaintiff.

John Joseph Hightower, Olson & Olson, Houston, TX, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

This lawsuit arises out of the efforts of Defendants Freeport, Texas ("Freeport" or "the City") and the Freeport Economic Development Corporation ("the FEDC") (collectively "Defendants") to appropriate a parcel of real property owned by Plaintiff Western Seafood Company ("Western Seafood" or "Plaintiff"). Now before the Court comes the City's Motion for Summary Judgment, to which Plaintiff has timely responded. For the reasons stated below, the Motion is hereby **GRANTED.**

### I. Background and Facts

The downtown section of the City of Freeport lies on the banks of the Old Brazos River. The City characterizes downtown Freeport and· the surrounding areas as economically depressed, with many tracts of land in a state of disuse or disrepair. The·City and the FEDC intend

to remedy this situation by developing a major marina on the Old Brazos River. Defendants predict that this development will stimulate an economic revival of the downtown district, increasing property values, creating new jobs, and increasing tourism. The City implemented a plan to finance the marina through low-interest loans of public money from the City through the FEDC. The marina would be constructed, owned, and operated by Freeport Waterfront Properties, Ltd. ("FWP"), a private entity. The City and the FEDC have negotiated a development agreement with FWP. *See* City of Freeport, Texas, Marina Project Development Agreement (Sept. 22, 2003), Motion for Summary Judgment, Exh. 4 ("the Development Agreement").

Plaintiff Western Seafood is a business that has provided services and supplies to commercial shrimp trawlers operating in the Old Brazos River. Plaintiff and its predecessors in interest have operated this business for over fifty years. Western Seafood owns several tracts of real property that border the river. The tract at issue in this litigation measures approximately nine-tenths of an acre and includes approximately 330 feet of waterfront. The disputed tract is part of a larger parcel of land owned by Plaintiff that contains a number of unloading docks and a state-of-the-art shrimp processing and freezing plant. Plaintiff submits that its riparian rights of navigation have been established by law as well as by years of actual, private, and continuous usage by Plaintiff. Plaintiff holds a U.S. Army Corps of Engineers permit to maintain and operate one dock, pier, wharf, or quay at the location where Defendants intend to build a marina. Defendants' marina plan calls for a series of piers or pleasure boat finger docks that will extend from the land at an angle of approximately seventy degrees. Plaintiff contends that the angle of the westernmost of these piers will cause them to cross the line perpendicular to the shore that marks the boundary of Plaintiff's riparian right of navigation. Plaintiff alleges that the westernmost piers will also cut off an established safe avenue of navigation that has historically been used by commercial shrimp trawlers trading at Plaintiff's facility.

The planned location of the marina project includes tracts of property that are currently owned by FWP as well as tracts of property that are not owned or controlled by FWP or Defendants. These uncontrolled tracts include the disputed tract of land owned by Western Seafood, mentioned above. *See id.* (identifying Plaintiff's property as the "Gore land"). The City states that the marina project cannot be completed unless Defendants and FWP acquire title to or the right to use all tracts identified in the Development Plan. The City therefore authorized the FEDC to acquire Plaintiff's land and other tracts by purchase if possible, or by eminent domain. The FEDC failed to reach an agreement with Plaintiff, and it intends to commence a state condemnation proceeding to acquire title to Plaintiff's property.

Obviously not inclined to surrender its property to the City or to the FEDC, Western Seafood filed its Original Complaint for Injunctive Relief in this Court on September 25, 2003. Plaintiff simultaneously filed a Motion for Preliminary Injunction to prevent the FEDC from commencing a condemnation suit in state court. On December 5, 2003, the Parties appeared at a hearing on Plaintiff's Motion for Preliminary Injunction. The Court denied injunctive relief, stayed and administratively closed the case, and suspended the hearing for settlement discussions. The Parties failed to reach an agreement,

and the case was reopened on April 8, 2004.

Shortly thereafter, on April 12, 2004, Plaintiff filed its Original Complaint for Temporary Restraining Order and Injunctive Relief in a new cause of action, No. G–04–242. On April 13, 2004, the Parties appeared at a hearing on Plaintiff's Complaint for Temporary Restraining Order and Injunctive Relief. At the hearing, the City agreed that it would not initiate condemnation proceedings in state court. The City cautioned, however, that FEDC, not the City itself, would be responsible for initiating condemnation proceedings. The Court denied the Temporary Restraining Order. No condemnation proceeding has been commenced by the City or FEDC in a Texas court.

On April 23, 2004, the City filed its Motion for Summary Judgment in both causes. Plaintiff filed its First Amended Complaint in G–04–242 on April 19, 2004 and its Second Amended Complaint for Injunctive Relief in G–03–811 on April 27, 2004, both of which added the FEDC as a defendant. On July 9, 2004, the Court Joined and Consolidated Cause No. G–04–242 into Cause No. G–03–811. Plaintiff's Second Amended Complaint seeks a declaratory judgment that Defendants are prohibited from taking or possessing the disputed property, as well as a preliminary and permanent injunction precluding the Defendants from commencing or pursuing condemnation or eminent domain proceedings in the courts of the State of Texas. Plaintiff alleges that Defendants' proposed taking of its property violates the Texas Development Corporation Act ("the TDCA"), Tex.Rev.Civ. Stat. Ann. Art. 5190.6 (Vernon Supp.2004), the Takings Clause of the Texas Constitution, Tex. Const. art. 1 § 17, and the Takings Clause of the United States Constitution, U.S. Const. amend. 5.

## II. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When one party moves for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. See id. at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. See id. at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255, 106 S.Ct. at 2513.

## III. Analysis

### A. The FEDC's Authority Under State Law

#### 1. The City's Authority to Create a Section 4B Corporation

The TDCA provides for two different types of development corporations,

which are distinguished by the size of the city creating the corporation. A city may create a corporation under Section 4A if the city is "located in a county with a population of 500,000 or fewer." Tex.Rev. Civ. Stat. Ann. Art. 5190.6, Sec. 4A(a)(1). Section 4B defines "Eligible city" to include a city (1) "located in a county with a population of 500,000 or more," (2) "that has a population of 400,000 or more," or (3) "to which Section 4A of this Act applies." *Id.* Sec. 4B(1). The significant distinction between the two subsections for purposes of this litigation is that each authorizes a development corporation to undertake different types of projects. In particular, Section 4B defines "Project" to include entertainment and tourist facilities. *See id.* Sec. 4B(a)(2).

The City maintains that it created the FEDC under Section 4B of the TDCA. Plaintiff argues that the TDCA does not authorize the City to create a 4B corporation. Plaintiff argues that Section 4B requires a city to have a population of 400,-000 or more or to be located in a county with a population of 500,000 or more. According to the 2000 census, Brazoria County had a population of 241,767. *See* United States Census Bureau, 2000 Census of Population and Housing, Summary Population and Housing Characteristics, PHC–1–45, at 6, Plaintiff's Rebuttal Exh. 1. Plaintiff argues that because Freeport is located in a county with a population of less than 500,000, it is not authorized by the TDCA to create a 4B corporation. The City relies on Section 4B(a)(1), which defines "Eligible city" to include "a city ... to which Section 4A of this Act applies." Tex.Rev.Civ. Stat. Ann. Art. 5190.6, Sec. 4B(a)(1)(C).

The relevant statutory language leaves no doubt that the TDCA permits smaller cities, such as Freeport, to create Development Corporations under Section 4B. By ignoring the expansive definition of eligible cities in Section 4B, which incorporates the qualification provisions of Section 4A, Plaintiff gets the statutory scheme backwards. The TDCA restricts the options available to large cities, which are only authorized to create development corporations under Section 4B, not small cities, which can create development corporations under either section. Because the TDCA permits the City to create a development corporation under Section 4B, its failure to meet the population requirements of that section does not entitle Plaintiff to injunctive or declaratory relief.

*2. Formation of the FEDC*

Next, Plaintiff argues that even if the City could create a 4B corporation, the FEDC lacks authority to condemn its property because its formation violates the specific requirements of Section 4B. Plaintiff alleges that the formation of the FEDC suffers from the following defects: (1) the Articles of Incorporation fail to include the statutorily required clause specifying that it may operate under Section 4(B), *see id.* Sec. 4B(b); and (2) Defendants failed to comply with the notice requirements of Section 4B.[1] The City argues in response that the FEDC's articles of incorporation have been approved by the Texas Secretary of State and that it has complied with all notice requirements under Section 4B.

Under the TDCA, the Texas Secretary of State's certification of a development corporation insulates that corporation from

---

1. Plaintiff asserts that the City failed to prove that it published notices of the proposed development in order to trigger a provision in

Section 4B(2)(a–3) that gives voters ten days to petition for a special election on the marina project. *See* Plaintiff's Rebuttal at 3.

attacks on its incorporation. Section 7(c) provides:

> After the issuance of a certificate of incorporation, the incorporation of the corporation shall be incontestable for any cause and such certificate of incorporation shall be conclusive evidence that all conditions precedent required to be performed by the incorporators and by the unit have been complied with and the incorporation has been incorporated under the Act.

*Id.* Sec. 7(c). Defendants submit the Certificate of Incorporation for the FEDC, dated December 30.1999, and signed by the Texas Secretary of State. *See* Certificate of Incorporation of The City of Freeport Industrial Development Corporation, Charger Number 1563553–01, Defendants' Response to Plaintiff's Rebuttal Exh. 1. Because the Texas Secretary of State has issued a certificate of incorporation for the FEDC, Plaintiff cannot secure injunctive or declaratory relief based on alleged defects in its formation.

The TDCA authorizes a city to undertake a project "unless within 60 days after first publishing notice of a specific project or type of general project the governing body of the city receives a petition from more than 10 percent of the registered voters of the city [requesting] that an election be held before the proceeds of taxes imposed under this section may be used to pay the maintenance and operating costs of a project." *Id.* Sec. 4B(a–1). Defendants submit evidence that it designated the marina as a project by Resolution 2001–0001 of the FEDC board of directors on February 27, 2003, and published notice of that designation twice in the Brazosport Facts newspaper as required by the TDCA. *See* Board of Directors of the Freeport Economic Development Corporation, Resolution No.2003–0001 (Feb. 27, 2003), Defendants' Reply to Plaintiff's Rebuttal Exh. 4; Affidavit of Bill Cornwell, Publisher, The Facts, Defendants' Reply to Plaintiff's Rebuttal Exh. 5 (reflecting publication of notice of the marina project in the Brazosport Facts on March 15, 2003, and March.22, 2003).[2] In any event, the City submits evidence that a special election was held to authorize projects like the proposed marina development. Section 4B provides that a special election is not required, even after a petition, if the voters have already approved a specific project, or "that general type of project" at a previous election. *See id.* The Court therefore finds that the alleged lack of notice furnishes no basis for relief.

2. Plaintiff objects to the evidence included with Defendants' Reply to Plaintiff's Rebuttal on two grounds. First, Plaintiff argues that the submission violates the deadlines imposed by the Court at the TRO hearing. While the evidence was submitted after the May 10, 2004 date originally set by the Court, it was submitted in response to an argument raised for the first time in Plaintiff's Rebuttal to Defendants' Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, which was filed on May 10, 2004. Defendants.are entitled to address each ground of relief argued by Plaintiff, and Plaintiff cannot reasonably complain of Defendants' failure to meet the May 11th deadline when it did not raise the argument until May 10th.

Second, to the extent that Defendants' Reply Exhibits 1 through 5 are offered as self-authenticating exhibits, Plaintiff objects and moves to strike on the ground that Defendants failed to provide written notice in accordance with Rule 902(11). *See* Fed.R.Evid. 902(11). Defendants argue, and the Court agrees, that the documents submitted in support of their Reply are self-authenticating under Rule 902(4), which does not require written notice to the opposing party. In a related point, Plaintiff complains. that Defendants' Exhibits are not supported by affidavit as required by Federal Rule of Civil Procedure 56(e). Defendants correctly point out that they rely on authenticated documentary evidence, not testimonial evidence; therefore, Rule 56(e) is inapplicable.

### 3. Private Marinas and the "Project" Requirement of the TDCA

■ Finally, Plaintiff claims that even if the FEDC is a properly formed 4B corporation, the TDCA's definition of "Project," which determines the activities a Development Corporation may undertake, does not include private marinas. Because a private marina does not qualify as a "Project" under the TDCA, Plaintiff argues, state law does not authorize Defendants to condemn property for such purpose, and this Court must enjoin their attempts to do so. Defendants maintain that the proposed marina qualifies as a "Project" under Section 4B(a)(2) of the TDCA, which defines the term to include "land, buildings, equipment, facilities, and improvements found by the board of directors to ... be required or suitable for use for professional and amateur (including children's) sports, athletic, entertainment, tourist, convention, and public park purposes and events." Tex.Rev.Civ. Stat. Ann. Art. 5190.6, sec. 4B(a)(2)(A). The City submits that the voters of Freeport created the FEDC for the purpose of promoting projects "related to tourist and water front development," see Resolution No.2003–1994, Defendant's Motion for Summary Judgment Exh. 2, at 2 (reflecting authorization of the formation of an Economic Development Corporation and the adoption of a sales and use tax to undertake projects "including but not limited to projects related to tourist and waterfront development"), and that the proposed marina development qualifies as a facility suitable for use for entertainment and tourist purposes and events.

The Court agrees with the City that the TDCA's definition of authorized "projects" is broad enough to include the proposed marina development. First, the plain language of TDCA Section 4B, quoted above, authorizes the TDCA to undertake projects for "entertainment" and "tourist" purposes. A common-sense reading of these terms includes the proposed marina development, through which Defendants hope to provide an entertainment venue to attract tourists to Freeport, and Plaintiff offers no controlling interpretation of the TDCA to suggest otherwise. Furthermore, the Court concludes that the marina meets the general definition of "project" under TDCA section 2, which includes "transportation facilities (including but not limited to airports, ports, mass commuting facilities, and parking facilities)," id. sec. 2(11), and which is incorporated by Section 4B. See id. sec. 4B(a)(2) (" 'Project' means land, buildings, equipment, facilities, expenditures, and improvements included in the definition of that term under Section 2 of this Act ...."). Because the proposed marina project falls within the statutory definition of "project," the TDCA does not prevent FEDC from condemning Plaintiff's property.

Because the record shows that the formation of the FEDC and the formulation of the marina development complied in all material respects with the terms of the TDCA, Plaintiff's state-law claims lack merit and furnish no basis for injunctive or declaratory relief. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** on these claims.

## B. The Public Use Requirement

### 1. The Texas Constitution

■ Plaintiff seeks injunctive and declaratory relief under the takings clause of the Texas Constitution. Article I, section 17 of the Texas Constitution provides in part, "No persons's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person ...." Tex. Const. art. I § 17. In their Motion for Summary Judgment, Defendants argue that Texas courts have

adopted a liberal interpretation of the public use requirement and that Texas law recognizes economic redevelopment as a public purpose; therefore, Plaintiff cannot show a violation of the public use requirement of the Texas Constitution.

The Texas courts have interpreted the takings clause of the Texas Constitution to require substantial deference to the legislature. The Texas Supreme Court has declared that "[t]he question of what is a public use is a question for the determination of the courts; however, where the legislature has declared a certain thing to be for a public use, such declaration of the legislature must be given weight by the courts." *Housing Auth. of Dallas v. Higginbotham*, 135 Tex. 158, 165, 143 S.W.2d 79, 83 (Tex.1940). Defendants argue that Texas courts have consistently upheld condemnations for a public purpose even if private parties took control of the property. *See Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699 (1959) (upholding an urban renewal initiative providing for redevelopment of slum areas by private enterprises, subject to certain restrictions, partially on the basis of a legislative declaration); *Higginbotham*, 135 Tex. 158, 143 S.W.2d 79 (upholding as a "public use" an urban renewal initiative that provided for clearing slums and construction of public housing); *Atwood v. Willacy County Navigation Dist.*, 271 S.W.2d 137, 142 (Tex.Civ.App.1954, writ ref'd n.r.e.) (upholding as a "public use" a scheme whereby property was acquired for industrial development by a navigation district and leased to industrial sites).

Plaintiff seeks to distinguish the above-cited cases on the ground that each involved an express declaration by the Texas legislature that the specific project qualified as a public use. Defendants respond that economic development is considered to be a public benefit by Texas constitutional and statutory law. *See, e.g.*, Tex. Const. art. 3 § 52–a (recognizing "the public purposes of development and diversification of the economy of the state"); Tex. Local Govt.Code Ann. § 380.002(a) (recognizing "the public purposes of development and diversification of the economy of the state, elimination of unemployment or underemployment in the state, and development or expansion of commerce in the state"). In adopting the statute that enables municipalities to create development corporations, the Texas legislature declared:

It is hereby found, determined, and declared:

(1) that the present and prospective right to gainful employment and general welfare of the people of this state require as a public purpose the promotion and development of new and expanded business enterprises and the promotion and development of job training;

.        .        .        .        .

(4) that the means and measures authorized by this Act and the assistance provided in this Act, especially with respect to financing, are in the public interest and serve a public purpose of the state in promoting the welfare of the citizens of the state economically by the securing and retaining of business enterprises and the resulting maintenance of a higher level of employment, economic activity, and stability . . . .

Tex.Rev.Civ. Stat. Ann. art. 5190.6(a)(1), (4) (Vernon Supp.2004). Based on this legislative determination that measures authorized by the TDCA serve a public purpose, Defendants argue that the proposed condemnation of Plaintiff's land does not violate the public use requirement of the Texas Constitution.

Read in the context of the Texas courts' deference to legislative determinations of

the public interest, the above-cited provision of the TDCA resolves the state constitutional issue. As discussed above, the proposed condemnation is part of a development plan that qualifies as a "project" under the TDCA. The legislature has determined that the project serves the public interest in economic development. Plaintiff is not entitled to a declaration that the condemnation violates the Texas Constitution or to injunctive relief, and Defendants' Motion for Summary Judgment is hereby **GRANTED**.

### 2. The United States Constitution

■ Plaintiff seeks a declaration that the proposed condemnation of their property violates the public use requirement of the Takings Clause. *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."). Plaintiff argues that the proposed marina does not qualify as a public use because it will be owned and operated exclusively by a private business enterprise. In Plaintiff's estimation, this is a paradigmatic case of the state's appropriation of one private individual's property for the enrichment of another private individual.

Defendants contend that the proposed condemnation and the marina project are calculated to serve the public purpose of economic revitalization. They rely on *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 243, 104 S.Ct. 2321, 2329–30, 81 L.Ed.2d 186 (1984), for the proposition that the state may redistribute property from one private owner to another as long as the redistribution serves a valid legislative purpose.

*Midkiff* arose out of the State of Hawaii's efforts to reform its traditional system of land ownership, which had evolved little from its feudal origins. By the mid–1960s, nearly all of the privately owned land in the State of Hawaii was held by 72 private landowners, who leased residential tracts to tenants. *See id.* at 232–33, 104 S.Ct. at 2325–26. Finding that the lopsided real estate market inflated land prices and harmed the public welfare, the state legislature enacted a scheme to condemn residential tracts and transfer ownership to existing lessees. A number of landowners challenged the appropriation of their property, arguing that the state's land redistribution scheme was unconstitutional under the Public Use Clause of the Fifth and Fourteenth Amendments.

The Court noted that "where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." *Id.* at 241, 104 S.Ct. at 2329–30. The Court concluded that the public use requirement was "coterminous with the scope of a sovereign's police powers," and it upheld Hawaii's land redistribution scheme as a valid exercise of its police powers. *Id.* at 240, 104 S.Ct. 2321. Addressing the question whether the State of Hawaii's efforts to correct the state's malfunctioning real estate market would be successful, the Court cautioned that "whether *in fact* the provision will accomplish its objectives is not the question"; the Constitution would be satisfied as long as the state legislature "*rationally could have believed* that the [statute] would promote its objective." *Midkiff*, 467 U.S. at 242, 104 S.Ct. at 2330 (quoting *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–85, 68 L.Ed.2d 514 (1981)). This extraordinary deference to legislative determinations of the public interest is based on the principle that "[s]ubject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."

*Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954), *quoted in Midkiff,* 467 U.S. at 239, 104 S.Ct. at 2329.

Plaintiff attempts to distinguish the present case from *Berman v. Parker,* upon which the *Midkiff* Court relied heavily, on the ground that the federal statute in *Berman* expressly authorized a federal agency to condemn property in order to alleviate bona fide slum conditions in Washington, D.C. But this argument asks the Court to engage in precisely the type of judicial second-guessing that *Berman* and *Midkiff* proscribe. Plaintiff essentially asks the Court to enjoin the City's attempt to implement its urban renewal plan because existing conditions in Freeport are not so dire as those that prevailed in the District of Columbia at mid-century. *Midkiff* eliminates all doubt that the assessment of social ills, the decision whether to remedy a particular ill, and the means to effect the remedy are uniquely within the province of the state legislatures, not the federal courts.[3]

This case involves a municipality's efforts to take, through eminent domain, one private party's property and transfer it to another private party to promote the public interest in a healthy local economy. These circumstances present stark and startling evidence of the potential for governmental interference with individual property rights. The grave implications of a broadly construed public use requirement have not escaped the notice of this Court or of commentators. *See, e.g.,*

Thomas W. Merrill, *The Economics of Public Use,* 72 Cornell L.Rev. 61, 61 (1986) (characterizing the public use requirement as a "dead letter"); Ralph Nader & Alan Hirsch, *Making Eminent Domain Humane,* 49 Villanova L.Rev. 207 (2004) ("[T]he courts have come to interpret the 'public use' requirement in a way that renders it meaningless, essentially giving governments carte blanche to take property for any reason whatsoever, including crass political purposes or speculative, transient economic purposes.").[4] The public "use" identified by the City is more realistically characterized as a public benefit that will, according to the City's predictions, flow from the new private owner's development of the property. While this might strike a rational and neutral observer as an unduly broad reading of "public use," resting on a rather speculative plan of urban renewal, it is consistent with the prevailing interpretation of the Public Use Clause.

On another level, this case is a clear illustration of the downside of what appears, sometimes only at a distance, to be economic progress. It is a sad but undeniable fact of economic life along the Gulf coast that commercial shrimping operations such as Western Seafood are struggling to survive in the face of intense overseas competition and rapidly emerging domestic shrimp farming industry. To make matters worse, traditional brown-water fleets are being steadily replaced by tourist-centered developments and even el-

---

**3.** Plaintiff suggests that the decisions of the City of Freeport are entitled to less deference than those of the U.S. Congress. The Court can safely assume, without casting aspersions, that the City of Freeport lacks the full national and international renown of the United States Congress. The Court is unaware, however, of any relevant doctrine that holds the legislative judgments of a state subdivision in lesser esteem than those of the legislatures of the several States or the United States.

**4.** The Court sympathizes with Plaintiff's bewilderment at its situation. Indeed, its strongest argument may be that the City's plans do not pass the smell test. But while engaged in constitutional interpretation, the Court must apply the law as the Supreme Court interprets it, regardless of its subjective sympathies.

itist yachting operations. From Portland, Oregon to Portland, Maine, America increasingly wants her waterways devoted to trendier pursuits than regional transportation and commercial fishing. This Court has one of the largest maritime dockets in the country and has great respect for all aspects of maritime industry. Galveston itself has long been home to a variety of maritime trades, but the vast majority of these trades have disappeared in the last 30 years. Shipping agents, ship's chandlers, dry-docks, marine surveyors, I.L.A. halls, seamen's unions, ship's pilots, tug and towing operations, mosquito fleets, net repair shops, and even tattoo parlors and rough-and-tumble drinking establishments have all given way to vast yacht-docking operations, imitation, generic restaurants, souvenir shops, and museums. To take another example, Salem, Massachusetts was the international capital of the worldwide whaling industry in the early nineteenth century, but outside the confines of the National Maritime Museum, a present-day visitor will not find a single whaling ship or any vestige whatever of the South China trade. Similar transformations have occurred in Boston, New York, Wilmington, Baltimore, Charleston, Savannah, Mobile, New Orleans, San Diego, San Francisco, Portland, and Seattle. But for all its love of hoary tales of barnacled ships and grizzly sailors, the Court cannot freeze time. The Supreme Court has made it abundantly clear that decisions about the most economically efficient use of property are squarely within the proper province of the legislature, and subject to narrow limitations, the federal courts must abide by those decisions, however callous to times passing by they might in some view seem.

Because Defendants' proposed condemnation of Plaintiff's property falls within the scope of the Public Use Clause as interpreted by the Supreme Court, Plaintiff is not entitled to injunctive relief or to a declaration that Defendants' proposed actions violate the public use requirement of the Fifth Amendment Takings Clause. Defendant's Motion for Summary Judgment is accordingly GRANTED.

### C. Justiciability of Permit Applications

■ Plaintiff seeks to enjoin Defendants from applying for a permit from the United States Army Corps of Engineers for construction of the marina development. Defendants assert that any claim arising out of a permit application is not yet ripe because no permit application is currently pending and because Plaintiff is required to exhaust its administrative remedies before challenging any permit that might issue in the future. Plaintiff responds that the issue is ripe for adjudication because Defendants have admitted that they intend to apply for a permit.

The doctrine of ripeness is designed, in part, "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998). This case differs from *Ohio Forestry* and similar cases in that no administrative action has been taken. Rather, Plaintiff appears to challenge Defendants' ability to apply for a permit from the U.S. Army Corps of Engineers. The essence of this claim is that any permit that might issue in the future would accomplish an unlawful purpose. To the extent that Plaintiff's challenge to a future permit application is based on a challenge to Defendants' right to take its property, the claim is ripe for adjudication and, for the reasons stated above, lacks merit. Any claim that arises out of a specific permit application

will not be ripe for review until the Corps of Engineers reaches a final decision.

IV. Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is hereby **GRANTED**. Plaintiff's claims for relief under Texas law, the Texas Constitution, and the United States Constitution are hereby **DISMISSED WITH PREJUDICE**. Each Party is to bear its own taxable costs, attorneys' fees, and expenses incurred herein to date. The Gore family, which have owned and proudly operated the Plaintiff company over two generations, are good and valuable citizens of a city that has seen hard times for many years. They have provided an excellent product, jobs, and city taxes that have benefited more than a few. This Court rules as it must today with a heavy heart. But as with the Village Smithy at the dawn of the age of automobiles, the future is often merciless in its mandate for change, and even the best among us must stand aside as successors emerge.

**IT IS SO ORDERED**