Kenton V. TOWNSEND, Appellant,

v.

THE HOUSING AUTHORITY OF THE CITY OF DALLAS et al., Appellees.

No. 6404.

Court of Civil Appeals of Texas.

Amarillo.

June 7, 1954.

Rehearing Denied June 28, 1954.

212

Hassell & Hassell, Dallas, for appellant.

Scurry, Scurry & Pace, Worsham, Forsythe & Riley, Turner, Rodgers, Winn, Scurlock & Terry, Dallas, for appellees.

PITTS, Chief Justice.

This is a suit for cancellation and rescission of a warranty deed, or in the alternative, for alleged damages in the sum of $42,500, because of alleged fraudulent representations. Appellant, Kenton V. Townsend, filed suit on July 1, 1953, against appellees, The Housing Authority of the City of Dallas, a corporation, and The Salesmanship Club of Dallas, a corporation, alleging the procurement by the Housing Authority from him and his wife by the use of fraudulent representations a deed conveying two described tracts of land located in West Dallas purportedly for Government housing purposes and then thereafter selling a portion of the said land as excess land to the Salesmanship Club for private commercial use. The case was tried to a jury, but the trial court withdrew

the cause from the jury after the evidence closed and rendered judgment for appellees as a matter of law, from which judgment appellant perfected his appeal to the Dallas Court of Civil Appeals and the same was transferred to this Court by the Supreme Court in equalizing the dockets.

Appellant predicates his appeal upon one point of error contending fact issues were presented for jury determination and presenting the same upon what he chooses to call four corollary propositions. By such means he contends that the alleged false and fraudulent representations were made to him by Leonard M. Cowley, an agent and representative of appellee, the Housing Authority, and by Fred L. Naumer, an agent and representative of the Public Housing Administration of Washington, D. C.; that any presumptions favorable to the Housing Authority and the acts of its agents had been successfully rebutted; that, if the agency and authority of the named agents were not conclusively shown, circumstances in connection with their acts presented a fact issue upon which appellant relied; and that the issues of injury and damages were raised by the evidence. In rebuttal appellees contend that appellee, the Housing Authority, acted legally and in good faith in acquiring the land in question; that appellant has failed to offer any evidence in support of the elements of fraud authorizing a cancellation of the deed, or damages in the alternative; and that having legally acquired the land in question and having used it for a legal purpose, the Housing Authority had the right to subsequently sell any excess land that was no longer needed for its housing project.

It should be observed that the trial court was required to submit only controverted controlling issues made by the pleadings and the evidence. It was not required to submit issues that were merely evidentiary, particularly when no other issues were raised to furnish a basis for recovery.

The record reveals that the Housing Authority of Dallas is governed and controlled by a Board of four Commissioners

appointed by the Mayor of Dallas, of which Board Louis Tobian, an enterprising citizen of Dallas, served as Chairman of the Board without compensation during all of the period of time of importance here and that James L. Stephenson served as Executive Director and Secretary of the Board. Both of them testified at length at the trial. The development of the housing project in West Dallas here involved was predicated upon the authority and powers granted to the Housing Authority by Article 1269k, Vernon's Civil Statutes, the constitutionality of which has been sustained in the case of Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 130 A.L.R. 1053.

As a result of a joint survey made by Dallas County and city officers, the Chamber of Commerce and other leading city agencies of Dallas, a written report was made to the Dallas Housing Authority Board on October 19, 1950, recommending the construction of 3,500 public housing units in a section of West Dallas to accommodate approximately 30,000 people, most of whom were then living in a "slum area" under deplorable sanitary conditions and a part of them in flooded areas. As a result of the said report the officers of the Housing Authority made exhaustive studies and investigations for a location and means to relieve the situation. The Board first took formal action on December 29, 1950, designating the site of the project hereinafter shown and began preparing a program of development by making application on January 29, 1951, for a loan from the Public Housing Administration of Washington, D. C., for developing the project, which loan was later consummated for such purpose. On April 11, 1951, the Board passed a resolution fixing and designating the boundaries of such a site for such a purpose as being bounded by Singleton Boulevard on the south, Hampton Road on the east, Canada Drive on the north and the old channel of the Trinity River and Westmoreland Road on the west, which site contained some 514 acres, including appellant's land here in question. On May 15, 1951, in compliance with the law the Board adopted a resolution declaring that the acquisition of the land situated within the project site, which included appellant's land here in question, was necessary for the housing project and authorized the acquisition of such land by negotiation, if possible, but by condemnation proceedings if need be. It was then known that most of the area would have to be practically rebuilt to give the occupants sanitary, livable quarters, including sanitary facilities, proper drainage, and means for ingress and egress, recreation grounds, etc.

The Housing Authority employed Leonard M. Cowley by written contract of date January 2, 1952, to secure options from the owners of lands within certain portions of the site, including appellant's land in question. Cowley was a Dallas real estate man of approximately thirty years experience in such business. By reason of his services in the United States Army and Reserve, he earned the rank of a "Colonel", which title was accorded him throughout the trial. The terms of his written contract of employment made it his primary duty to procure options on a portion of the lands within the site from the owners thereof subject to the approval of the Housing Authority but he was "not authorized to obligate the local Authority or subject it to any liability, cost or expense whatsoever except as herein provided". The contract further provided that the Public Housing Administration of Washington, D. C., which made the loan for developing the project, must authorize an acceptance of an option before it became binding. There was nothing in Cowley's contract authorizing him to bind the Housing Authority concerning the future use of the land in question.

Appellant, Kenton V. Townsend, testified he had previously been in the retail grocery business in West Dallas but was not then engaged in any business; that he once owned and conveyed the land here in question to the Housing Authority; that before the negotiations began, he saw in the newspaper an account of the Housing Authority's plan and tried in the spring of

1951 more than once to learn through Housing Authority employees if it wanted to buy his land in question but could not find out if it did; that he knew his land could be lawfully condemned by the Housing Authority for building low cost housing if he did not agree to sell the land for such a purpose; that Colonel Cowley visited him first in the spring of 1952 and discussed buying his land; that he later brought with him Fred L. Naumer to talk about buying his land, at which time he (appellant) expressed concern about rumors that there was to be a big shopping center in the middle of the project or on the outskirts thereof, which would be in competition with his business when he said Naumer told him that the Housing Authority and the Government were building nothing but low cost houses and he assured appellant there would be no shopping center built anywhere in the project; that he was likewise advised that his land would be taken by condemnation proceedings if he did not sell the same for the proposed use; that he was then offered the sum of $27,500 for his land, which offer was refused; that Cowley later returned alone on or about February 1, 1952, and offered him $32,500 for his land, produced an optional contract for such offer, which appellant and his wife signed with Cowley as a witness on February 1, 1952. Appellant further testified that long before any sale negotiations began, he discussed all of the proposed plans with his attorney, who is now representing him in this cause; that he later discussed all negotiations and the advisability of signing the optional contract with his said attorney on the day before it was executed and showed his attorney a copy of the said contract and that he also talked with his banker about the matter before signing the option contract next day; that he also discussed with his attorney the matter of signing the deed, which he and his wife executed at the office of a title company on February 11, 1952, conveying to the Housing Authority Lot 12, Block 3 of L. A. Strother's Hilltop Addition in Dallas and the east 50 feet of Lot 5, Block A of Hampton Garden's Addition in Dallas with appellant reserving the salvage from the buildings on the said land. Appellant further testified that he believed the agents and officers of the Housing Authority had no intention of using his land for any part of the housing project at the time of the conveyance but intended the whole time to sell it for a shopping center, and that such was his belief at the time of the sale, however, he further testified that he had no way of knowing such intentions. Appellant likewise testified that he did not believe anything Cowley said, however, he testified further that Cowley never made any representations to him about a shopping center or the use of his land for such; that Mr. Naumer made such representations to him, and that he did not believe everything Naumer said, although he wanted to believe him because he was a Federal Government employee and he did believe Naumer's statement when he said the Government would not build a commercial center.

Appellant pleaded that Leonard Cowley and Fred L. Naumer made the alleged false representations to him upon which he relied. In order to cancel the deed on the grounds of the alleged fraud, appellant must have established (1) that a false representation, one or more, of a material fact was made to him by one or both of the alleged agents as such of the Housing Authority; (2) that he believed the false representations made to him by one or more of the Housing Authority's legal agents; and (3) that he relied upon such false representations so made. Booth v. Chadwick, Tex.Civ.App., 154 S.W.2d 268; Janes v. Stratton, Tex.Civ.App., 203 S.W. 386; 14 Tex.Jur. 852, Sec. 85. Before appellant was entitled to have the case submitted to the jury, the burden was upon him to raise issues by competent evidence to the effect that either Cowley or Naumer or both of them, as an agent or agents of the Housing Authority and with authority or apparent authority to so act, made one or more false representations to him about one or more material facts upon which he relied.

There is no evidence showing or tending to show that either Cowley or Naumer had any authority from the Housing Authority or any of its officers to make representations to any land owners within the site in question concerning any shopping center or commercial use to be made of any property within the site being acquired. There is testimony to the effect that no such authority was given to either of them. The evidence also reveals that Naumer was not an employee of the Housing Authority but was a Federal Government employee. Cowley alone finally procured the optional contract as well as the deed. Appellant testified that Cowley made no representations to him about a shopping center or the use to be made of his land and that he did not believe anything Cowley said anyway. For these reasons appellant's testimony eliminates Cowley and we are not therefore concerned as to whether or not Cowley was an agent of the Housing Authority or had any authority or apparent authority to make the alleged representations concerning a shopping center or the future use to be made of appellant's land. Naumer was not an agent of the Housing Authority but was an agent and representative of the Public Housing Administration of Washington, D. C., and appellant so alleged. Appellant also testified that Naumer was an employee of the Federal Government. Naumer's statement to appellant was to the effect that neither the Housing Authority nor the Federal Government could or would build any shopping center or any commercial buildings on the project site. Such a statement was not false since neither the Housing Authority nor the Government had the authority to do so. At any rate, appellant was not misled by this or any other such a statement, since he testified he believed at the time the Housing Authority acquired his land that its officers then intended to use the same for commercial purposes. Since appellant believed his property would be so used at the time it was acquired and since he was counselling with his attorney prior to and at the time of the transactions, he could easily have protected himself against such use of his land by having inserted in the deed of conveyance a restrictive covenant to the effect that his land could be used only for the housing project but no such restrictive covenant was placed therein.

[2–5] It is our conclusion that appellant failed to raise by competent evidence any issue of fraud or any issue of agency with authority or apparent authority to bind the Housing Authority, and for the same reason the Salesmanship Club was not therefore bound. In so holding, we are aware of the law giving a jury the right to pass on controverted issues and that a jury verdict under such circumstances is binding if there be any evidence of probative force to support it. However, such evidence must legally have some probative force. Mere detached statements or excerpts therefrom, which alone have no probative force and which do no more than possibly furnish a basis for suspicion or speculative argument are not controlling, particularly as pitted against positive unimpeached evidence to the contrary that is without suspicion. If there be no competent evidence to raise a material issue under the pleadings and the evidence, it is the duty of the trial court to give a peremptory instruction or withdraw the action from the jury and render judgment as a matter of law. Urso v. City of Dallas, Tex.Civ.App., 221 S.W.2d 869 (writ refused).

The record further reveals that after the site was purchased, contracts were let for grading, constructing project foundations, constructing buildings, providing sewage service, overhead electric distribution, landscaping, parks, playgrounds and otherwise developing the project. The evidence conclusively reveals that it was the original purpose of the Housing Authority to use all of the site for the housing project and for no other purpose. Yet it was known that such a project created many problems involving housing, streets, sewage, water, fuel and light service, health, recreational, educational and many

other such matters that may require changes to be made in the original plans. In August or September of 1952 Stephenson, Director of the Housing Authority, was approached about excess land for a shopping center, but Stephenson then advised that it did not appear that there would be any surplus land available. The officials of the Public Housing Administration of Washington, D. C., were also approached and, by authority of a letter of date October 24, 1952, approved the sale and use of any excess land in the project for a shopping center if the Housing Authority found any such excess land to exist. The Housing Authority concluded in January of 1953 that a 30-acre tract of land within the site, being then mostly lakes, cess pools, bogs and being then used primarily for drainage purposes, may be declared excess land, provided an easement 100 feet wide across the same could be retained as an easement for drainage purposes. On June 10, 1953, the Commissioners of the Housing Authority declared, after the grading and drainage plan of the 30-acre tract had been accomplished, the same to be excess land, except for the easement 100 feet wide across it being retained for drainage purposes, and contracted to sell the said 30-acre tract less the said easement to appellee, the Salesmanship Club, a charitable corporation for a nonprofit use, for a consideration of $163,000, a price fixed by independent appraisers. A portion of the land purchased from appellant, and particularly the east 50 feet of Lot 5, Block A of Hampton Garden's Addition, is within the said 30-acre tract of land. Hence this lawsuit resulted.

■ In our opinion the Housing Authority had a legal right to purchase appellant's land or to resort to the power of eminent domain, if necessary, to take the said land for the purpose intended. Article 1269k and particularly Section 12 thereof. But appellant conveyed the land to the Housing Authority by a general warranty deed, with full information either had or available to him and after consulting with his attorney.

■ In our opinion the evidence conclusively reveals that the Board of Commissioners of the Housing Authority purchased by a general warranty deed the land in question in good faith for a housing project site after declaring by resolution according to law that the acquisition of the said land was necessary for the purpose intended; that there was no evidence of probative force of any intent to use the said land for any other purpose at the time it was purchased; that the said land was conveyed without any restrictive covenants as to the future use to be made of it; that no fraud has been shown in connection with the sale of the said land; and that appellant has not shown he was actually damaged. For these reasons it is our opinion that the Housing Authority owned the land without restrictions and had the right to subsequently sell the land in question as excess land when it determined that the portion thereof shown was no longer needed for the housing project. Wells v. Burroughs, Tex.Civ.App., 65 S.W. 2d 396; Guardian Development Co. v. Jones, Tex.Civ.App., 86 S.W.2d 466; Stone v. Tigner, Tex.Civ.App., 165 S.W.2d 124; Davis v. Davis, 141 Tex. 613, 175 S.W.2d 226; Sunderman v. Roberts, Tex.Civ.App., 213 S.W.2d 705; State v. Brewer, 141 Tex. 1, 169 S.W.2d 468. In the case of Baker v. Baker, Tex.Civ.App., 207 S.W.2d 244, 249, the court approved the following rule: "'"No rule of law is better settled than that where a deed has been executed and accepted as performance of an executory contract to convey real estate, the contract is functus officio, and the rights of the parties rest thereafter solely in the deed."'" If the acts of the Housing Authority in so doing must be governed by the rules of law applicable to the powers of eminent domain, such still support the sale of the excess land to the Salesmanship Club under the facts and circumstances presented, since the acts shown were no more than the reasonable exercise of the powers given the members of the Board of Commissioners which governed the Housing Authority for the good of a public enterprise. Webb v. Dameron, Tex.Civ.

App., 219 S.W.2d 581; City of Dallas v. Malloy, Tex.Civ.App., 214 S.W.2d 154; Meaney v. Nueces County Nav. Dist. No. 1, Tex.Civ.App., 222 S.W.2d 402; Bradford v. Magnolia Pipe Line Co., Tex.Civ.App., 262 S.W.2d 242.

For the reasons stated appellant's point of error, together with the corollaries made a part thereof, are all overruled and the judgment of the trial court is affirmed.