**C. A. VILBIG et al., Appellants,**

**v.**

**HOUSING AUTHORITY OF THE CITY OF DALLAS et al., Appellees.**

**No. 15014.**

Court of Civil Appeals of Texas.

Dallas.

No. 4, 1955.

Rehearing Denied Jan. 13, 1956.

Wm. Andress, Jr., Dallas, for appellants.

Scurry, Scurry & Pace, Worsham, Forsythe & Riley, and Turner, Rodgers, Winn, Scurlock & Terry, Dallas, for appellees.

YOUNG, Justice.

The suit of appellants was for rescission and cancellation of three deeds to lands located in defendant Authority's West Dallas project of Public Housing, claiming legal fraud in the circumstances of their acquisition; making party thereto the Dallas Salesmanship Club. At close of testimony the trial court withdrew the case from consideration by the jury; rendering judgment that plaintiffs take nothing, which ruling is the occasion of this appeal. In Townsend v. Housing Authority, etc., Tex.Civ.App., 277 S.W.2d 211, the complaining party had likewise unsuccessfully prosecuted a suit for rescission of deed against these same appellees. However, for complete sequence, much of the same factual background, though of like nature, must be restated.

As mentioned in the cited case, the Trinity River District, commonly known as West Dallas, had long been recognized as a slum district; some 30,000 people living there with no sanitary sewage facilities; largely without running water, with shallow wells located in vicinity of dry outside toilets; and many abandoned gravel pits serving as dumping ground for garbage, refuse and debris, thereby constituting a serious menace to community health. The area occupied for most part a territory once in the flood plain of the Trinity River; later fairly well protected by a levee system, but outside the Dallas municipal limits. In early 1950 various civic committees, after studies of such locality, had proposed to appellee Authority a Housing Project for West Dallas, and in September the latter Body filed with Federal Officials in Washington an application for program reservation covering 3,500 units of low-cost rental housing; the local Authority at the same time entering into a cooperation agreement with City of Dallas, Dallas County, and Dallas Independent School District respecting the development of such a program. Accordingly, the firm of Forrest & Cotton, outstanding engineers and long familiar with drainage conditions of the immediate Trinity River Basin, were employed to make an analysis of the entire West Dallas area and recommend a site for the project; Mr. Forrest making verbal report to the Housing Commissioners on December 1, 1950, discussing the various problems; appellee Authority later in December approving a preliminary development program and site; fixing same as covering some 513 acres of land bounded as follows: Westmoreland Road on the west, Singleton on the south, Hampton Road on east side, and on north by the old winding river channel and Canada Street. Above development program, filed by the Public Housing Authority at Washington in January 1951, demonstrating feasibility of the project, was approved; the local Authority then entering into a contract with the Federal agency for a loan of $37,500,000.

The lands of plaintiffs, in controversy, lie in the southeast 30-acre section of the project tract; more particularly, some twelve acres thereof bounded by Singleton Boulevard running east and west, Hampton, north and south, also by Fishtrap Road and Toronto Street, now Pritchett Drive. In the preliminary development plan, this southeast portion of the site had been considered an unbuildable area, the exhaustive report (Exhibit J) suggesting a recreational use be made thereof. But material here, the steps taken by appellee Authority for consummation of the project, in order of occurrence, were as follows: In April 1951,

the local Authority by formal resolution fixed the boundaries for the project as already described; in May, through the Board of Commissioners, adopting a resolution declaring that the acquisition of lands (513 acres) within such boundaries was necessary; and pursuant to provisions of Art. 1269k authorizing the obtainance of fee simple title thereto, either by negotiation or condemnation proceedings. Plans for demolition, grading, foundations, etc., were then in order, and after June 8, 1951 (upon resolution adopting a site for location of buildings) work was actually begun; and plans for construction of buildings being approved on January 15, 1952, contracts therefor were entered into. Touching the property in suit, situated as above stated in the project site, on November 23, 1951, plaintiffs deeded to appellee Authority by instrument of warranty the five improved lots in Hampton Gardens Addition for a cash consideration of $40,000. In November 1951 and April 1952, the Authority had filed condemnation suits on the Hoffman and Foy tracts; and thereafter, while these cases were in County Court at Law on appeal by plaintiffs, same were settled by agreement of the parties relative to cash compensation to be paid; and said tracts were conveyed to the Authority by general warranty deeds, viz.: Hoffman property for $1,750 and Foy for $52,250.

C. A. Vilbig, J. W. Vilbig, Jr., and sister, Mrs. Virginia Vilbig Taff, sued individually and as devisees under the will of J. W. Vilbig, Sr.; plaintiffs first named owning jointly the Hampton Gardens lots. Plaintiffs alleged that appellee Authority had filed above and other suits against them, and under threat of condemnation the described deeds were executed; that they had been holding such property for business purposes and would not otherwise have parted with title; that the petitions for condemnation filed by the Authority alleging a necessity for acquisition of the property for public housing construction were false and untrue, as also was the resolution by its Board of Commissioners declaring a necessity; such actions by the Board being fraudulently taken, and "in

fact it was at no time the intention of the Housing Authority to erect any type of low cost housing, buildings, or improvements to be rented for homes, upon any part of the plaintiffs' property." Plaintiffs then allege the negotiations commenced by the Authority and Dallas Salesmanship Club prior to March 1953, whereby the southeast 30 acres was to be declared excess land and sold to the Club as a Shopping Center for a consideration of $163,000, the lands in question being a part of said acreage. As such phase of the controversy is fully detailed in Townsend's appeal, supra, reference is made thereto for brevity; plaintiffs charging that because of aforesaid "false and fraudulent representations made personally and to the court," these three deeds should be canceled, set aside, and held for nought; offering to do equity by return of consideration received.

Defendant Housing Authority answering, alleged in substance that all issues attempted to be raised in plaintiffs' pleadings were such as could and should have been raised and determined in condemnation suits; that plaintiffs, being threatened with statutory proceedings and two suits filed against them, the issues now pled had been waived, compromised and settled by their later conveyance of the properties through general warranty deeds; that all of said site was needed for adequate development of the 3,500 units on firm ground with proper foundations, for proper grading and drainage of the project; elimination of unsanitary conditions existing on those parts of the acreage deemed unbuildable, but which constituted a serious health hazard; also in order to provide sufficient areas for storing of drainage and storm waters.

The Authority denied the making of any false allegations, representations, or statements to plaintiffs, or of a fraudulent determination of necessity for the acquisition of their property; that pursuant to said resolution it commenced to acquire by purchase or condemnation more than 1,000 different parcels of land, at the same time its engineers and architects began development of plans and specifications for demolition of existing structures, grading of en-

tire site for laying of sanitary sewers, inclusive of the "West Bank interceptor" which would serve the entire West Dallas area; for installation of water and gas mains, power and light distribution systems, consequent upon its Project Tex 9–11 to provide housing units for persons of low income; requiring the execution of seventeen major contracts; that because of size of the project and conditions existing, particularly with reference to unbuildable areas, constant changes had to be made in the plans, inclusive of building locations, underground utilities, and for drainage of the entire site. That at time the lands of plaintiffs were acquired, the Authority had not determined on exact use to be made of the southeast portion; knowing however that abandoned gravel pits, bogs, and cesspools would have to be filled in, and grading done for care of storm waters; not having then decided on methods of drainage, whether by ditches or storm sewers; nor did the Authority then know the ultimate utility of said southeast section, whether for parks, playgrounds, administration buildings, or other purposes, and that such determination could not be made until long after said lands were acquired. That in the Spring of 1953, Housing Officials decided that the southeast portion might be excess property, which was after their engineers had completed plans and made final determination of drainage problems; the Authority then having the alternative of adapting said area to parks, playgrounds and community facilities, or of declaring said land excess and returning it to the tax rolls. That the latter course was finally decided upon and contract entered into with the Salesmanship Club for disposition of said 30 acres; reserving, however, an easement 100 feet wide, running diagonally across the tract, for drainage purposes; further alleging that the acquisition of said tract was necessary for control and drainage of storm waters, to properly fill in the cesspools, bogs, and areas formerly used for dumping of garbage, refuse, and debris; and that in making such determination of necessity, the Commissioners acted in good faith and in accordance with their best judgment. Answer of appellee Salesmanship Club was similar in content to the allegations just above detailed.

Plaintiffs argue in a single point the sufficiency of evidence to sustain a jury finding of *no necessity* for the acquisition of their lands[1]; appellees answering by three counterpoints; in essence that (1) the Housing Authority was acting legally and in good faith in acquiring the property of plaintiffs; (2) plaintiffs have offered no evidence of fraud in essential elements such as would authorize a cancellation of deeds; and (3) having legally acquired the land and used it for the purpose of developing its housing project, the Authority can subsequently dispose of any excess when and if no longer needed.

1. Such point is here quoted: "When none of the Housing Authority Commissioners testify to any specific use to be made of the property, but admit that at the time of the resolution of necessity of taking for a housing project there was not and never had been any intention to erect low cost dwellings on the property, but that it was considered unbuildable, and there had not been any plans prepared for any use to be made of the property, and the Commissioners affirmatively testified that they relied implicitly on the advice of the engineer, who also testified that he had not prepared any plans for any use of the property but considered it necessary to take the property in order to reach natural boundaries, and for the protection against improper usage of the land, and because there existed an unsolved drainage problem which he subsequently solved by following the then-existing natural drainage, thereby verifying that the lands were not necessary so that the Commissioners officially found that they were not necessary and sold them for private commercial development, all within less than a year from acquisition of the property and before completion of the project, there was sufficient evidence to have sustained a jury finding that there was no necessity for the taking, and that a resolution that there was such necessity was arbitrary, an abuse of discretion, unfounded in fact, and made without due regard to the rights of others, and the trial court erred in instructing a verdict and refusing to submit the case to the jury."

Development of the "West Dallas Project" is predicated upon powers granted the Housing Authority by Art. 1269k, Vernon's Ann.Civ.St. which law is fully set forth in Higginbotham's appeal to the Supreme Court, Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 88, 130 A.L.R. 1053; for which reason we quote only portions thereof. Sec. 3(i) defining "Housing Project," provides in part: "'Housing Project' shall mean any work or undertaking: (1) to demolish, clear, or remove buildings from any slum area; such work or undertaking may embrace the adaption of such area to public purposes, including parks or other recreational or community purposes; or (2) to provide, decent, safe, and sanitary urban or rural dwellings, apartments, or other living accommodations for persons of low income; such work or undertaking may include buildings, land, equipment, facilities, and other real or personal property for necessary, convenient, or desirable appurtenances, streets, sewers, water service, parks, site preparation, gardening, administrative, community, health, recreational, educational, welfare, or other purposes; or (3) to accomplish a combination of the foregoing. * * *" Sec. 8(h): "* * * No provisions of law with respect to the acquisition, operation, or disposition of property by other public bodies shall be applicable to an authority unless the Legislature shall specifically so state"; Sec. 12, Eminent Domain: "An authority shall have the right to acquire by the exercise of the power of eminent domain any interest in real property, including a fee simple title thereto, *which it may deem necessary for its purposes under this Act* after the adoption by it of a resolution declaring that the acquisition of the real property described therein is necessary for such purposes. An authority may exercise the power of eminent domain in the manner provided in Articles 3264 to 3271, both inclusive, Revised Civil Statutes of Texas, 1925, and Acts amendatory thereof or supplementary thereto; or it may exercise the power of eminent domain in the manner provided by any other applicable statutory provisions for the exercise of the power of eminent domain. * * * As amended, Acts 1941, 47th Leg., p. 926, ch. 563, § 1." (Emphasis ours.) Constitutionality of Art. 1269k has been sustained in Housing Authority of City of Dallas v. Higginbotham, supra, the project there involved being identical with that developed and now completed in the instant case; our Supreme Court going on to say in such connection: "* * * The law is well established in this state that where the power of eminent domain is granted, a determination by the condemnor of the necessity for acquiring certain property is conclusive in the absence of fraud. * * *" Appellants admit to the soundness of the principle just stated; also to the burden being upon them of showing by a preponderance of evidence an abuse of discretion on part of the Commissioners in the exercise of their statutory powers of eminent domain. It is argued that fact issues are raised throughout the record of a planned acquisition by the Commissioners of surplus land, amounting to an abuse of discretion; properly determinable by jury as in Brazos River Conservation and Reclamation District v. Harmon, Tex.Civ.App., 178 S.W.2d 281, and King v. Harris County Flood Control Dist., Tex.Civ.App., 210 S.W.2d 438.

Turning to a voluminous record, the testimony deemed material must necessarily be summarized: Charles A. Vilbig, plaintiff acting on behalf of the others, stated that they were holding their lots and acreage for business purposes, at no time desiring to sell; that upon reading of the petition for condemnation, he believed the allegations made that the Housing Authority was acquiring their lands "for the purpose of constructing, erecting, maintaining, and operating a part of the Housing Project thereon"; but that at time of execution of the warranty deeds in question nothing was discussed except values or amounts of money to be paid; James A. Stephenson, Executive Director of the Authority, testified to employment of Forrest & Cotton at the outset for recommendations of project area, site, and location of boundaries, since Mr. Forrest was more familiar than

anyone relative to the drainage of lands in the Levee District; the latter recommending the boundaries of Hampton Road and Singleton on east and south, inclusive of plaintiffs' land. Messrs. Burns, Mitchell, and Tobian, Commissioners, testified to their exercise of best judgment in choice of the entire project site, based upon information concerning the immediate problems of drainage and sanitation; Mr. Tobian, Chairman, at first viewing the whole area as "almost unbuildable," with the southeast section one of its "foulest" parts.

Engineer Forrest testified to his initial recommendation for site and boundaries for these 3,500 units of housing viz.: "Q. Now, what were your reasons why you thought it was necessary to go to those boundaries? A. Well, whenever you are going to create that kind of an improvement such as the construction of 3,500 dwelling units for people to live in and to where they can get to and from their places of residence you are confronted with the absolute need of proper sanitation, proper drainage, protection from fire hazards as near as you can, and within this boundary it was possible to establish those protective measures in a pretty substantial sort of way. For instance, a street, as we have on three sides of this project and the channel itself constitute excellent barriers from the standpoint of fire hazard, and this territory was just like a tinderbox, not only where these buildings are now, but on all sides of it. It was in the County, not in the City at that time, had no fire protection that you could speak of, so the first thing we needed was natural barriers and these streets and the river channel gave us that. In the second place, those natural barriers provided an opportunity to work out drainage plans and anybody who knows West Dallas knows that any spot out there has drainage problems and within the boundaries it was possible to work out a drainage plan, not only of the area bounded by the streets and the river, but also of the drainage that had to come in from the south side of Singleton Boulevard." He testified to many pools of surface water standing on the 30 acres; of

other lagoons and water to the west and northwest, such as Vilbig Lake and Westerfeld Lake, the course of drainage being to the northwest—the old (abandoned) river channel; that plans for drainage of the southeast corner could not be developed until questions of drainage involving the old channel back to Vilbig Lake had been settled; and this because all drainage had to go via Vilbig Lake through a series of lagoons to the northwest, so that plans were naturally started at the lower end of the drainage district, i. e., the old river channel; further it was not until December 1952, that plans for drainage of the southeast section were first detailed, revised by later plans attached to defendants' exhibit H (approved by the Board June 10, 1953), and consisting of construction of drainage ditch 100 feet wide, five feet deep, extending northwestwardly across the 30 acres and connecting with Vilbig Lake. As regards this portion of the site, the development program of December 1950, had stated: " * * * The area to be acquired includes some land that must be classed as unbuildable inasmuch as this land has been used in the past for quarrying gravel, which has resulted in the formation of numerous sloughs, shallow lakes and ravines. A number of these areas have been, or are now, being filled with garbage and trash. For this and other reasons these areas must be considered unbuildable for all practicable purposes. It is essential however that these areas be acquired by the Housing Authority in order to properly control sanitary fill and reclamation of these areas so that the 3,500 units of housing to be constructed will be adequately protected from health hazards which could be caused by indiscriminate and uncontrolled dumping of garbage and refuse of all sorts. It is further essential that these areas be acquired by the Authority inasmuch as the very nature of the terrain is such that the overall drainage plan necessary to adequately serve and protect the entire area must be prepared and executed taking into consideration the fact that proper drainage of the adjoining areas must be coordinated with that of the housing units. Inasmuch as the area under consideration is now outside the

city, there *ir* no zoning. It is necessary therefore that the Local Authority own and control property immediately abutting the low-rent public housing units in order to prevent the building of adjacent slums on these areas which are classed as unbuildable for legitimate construction. * * * The general southeastern portion of the site although not suitable for residential or other types of construction has excellent potentialities for park development. * * *."

▮ Despite above quoted excerpts of grounds for acquisition of said original unbuildable area, appellants in their single point ascribe to the Authority an ulterior motive (an intention by the Commissioners from inception of the enterprise to acquire and later use plaintiffs' property for commercial purposes) ; stressing as significant (a) that no buildings at any time were projected for the 30-acre tract; and (b) the acquisition of fee simple title, when it could and should have been determined initially that only an easement would be required.[2] It was not essential under the law that buildings be spread over the entire site, bearing in mind that "Housing Project," as defined in Art. 1269k is inclusive, not only of Housing units, but "buildings,

land, equipment, facilities, and other real or personal property for necessary, convenient, or desirable appurtenances, streets, sewers, water service, parks, site preparation, gardening, administrative, community, health, recreational, educational, welfare, or other purposes; * * *." Prior to August or September 1952, date of first mention of a Shopping Center by Mr. Cullum of the Salesmanship Club, there is no evidence of any plan on part of Authority and officials for ultimate use of the southeast portion of the site other than for elimination of health, fire, and drainage problems and development of the area for parks and playgrounds.[3] And a subsequent determination by the Authority that the acreage, first acquired for purpose of controlling drainage of pocketed sloughs and unsanitary conditions prevalent thereon, might become excess land, constituted no evidence circumstantial or otherwise that the Commissioners intended from the beginning to use plaintiffs' land for commercial purposes. A change of plans, arrived at during the course of this vast project, leading to a probability of excess land, under instant facts and circumstances, does not amount to capricious or arbitrary action as defined in Webb v. Dameron, Tex. Civ.App., 219 S.W.2d 581, 584; the Ama-

2. Appellants strongly argue that the Authority is here attempting to accomplish *indirectly* the object sought *directly* in McCord v. Housing Authority, etc., Tex.Civ.App., 234 S.W.2d 108, but the fact situations are not analogous. There the avowed purpose was to acquire slum areas, replan, and redevelop and sell or lease to private enterprise, under Title 1 of U. S. Housing Act of 1949, 42 U.S. C.A. § 1452 et seq.; whereas the present project was pursuant to Title 3 of U. S. Housing Act, 42 U.S.C.A. § 1401 et seq., supplemented by Art. 1269k, the latter legislation having been held constitutional in the Higginbotham case. We simply held in the McCord case that Title 1, U. S. Housing Act, could not be availed of absent appropriate State legislation. And in Brazos River Conservation & Reclamation District v. Harmon, supra, also relied upon by counsel, the Eastland Court had concluded as a matter of law that such conservation district was "created primarily for the purpose of

preservation, conservation and the distribution of public waters and the generation of hydro-electric power, and no proper rule of construction will extend the meaning of the law so as to allow it the authority to condemn private property *primarily* for parks, camp sites and recreational purposes." (Emphasis ours.)

3. In the Forrest brochure, submitted to the Authority in March 1951, the statement appeared relative to the southeast section, that: " * * * If filling of excavated areas is carefully done with compacted earth they will become satisfactory for further expansion of the projects if the needs arise or they may be sold to private developers under restrictions that will assure good planning and modern home construction. * * *." However, such conception of the engineer was never approved or adopted by appellee Board of Commissioners.

rillo Court holding that: " ' "Action is not arbitrary or capricious when exercised honestly and upon due consideration, where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached." ' " In short, as stated in Townsend's Appeal under almost identical facts [277 S.W.2d 215]: " * * The evidence conclusively reveals that it was the original purpose of the Housing Authority to use all of the site for the housing project and for no other purpose * * *."

Appellees under their second and third counterpoints urge as further ground of affirmance that, (a) plaintiffs, having conveyed their property by general warranty deeds without restriction as to its future use, are in no position to complain; and (b) the Authority, upon acquisition of fee simple title, had power to sell such property at any time that it determined that same was no longer needed for the housing project. A point similar to "a" above was presented in the Townsend Appeal and upheld by the Amarillo Court; sufficiently stated in Syllabus 7 of that case, reading: "Where plaintiff had conveyed land to city housing authority without any restrictive covenants as to future use of such land, and neither fraud nor damage to plaintiff was shown in connection with such conveyance, housing authority owned the land without restrictions and had right to subsequently sell the land as excess land when it determined that portion thereof was no longer used for housing project. Vernon's Ann.Civ.St. art. 1269k."

It is submitted that above holding is also decisive of the instant appeal, no restrictive covenants appearing in these deeds. The two situations are indeed of similar pattern; Townsend furthermore alleging that he sold under threat of condemnation, though under assurances that his property would not be developed for commercial purposes; the Appellate Court holding that his deed was executed "with full information either had or available to him * *." The Vilbigs were likewise chargeable with knowledge from the 1950 development program that the southeast portion of said site was labeled "unbuildable"; the report going on to say that the 30-acre tract was to be acquired of necessity for purpose of controlling drainage and elimination of present unsanitary conditions; and suggesting recreational use thereof (after reclamation), or for parks and playgrounds. Were these plaintiffs, then, really in any better position than Townsend to assert fraud? But the doctrine of stare decisis is more correctly applicable to decisions of our Supreme Court; 11 Tex.Jur., Courts, p. 838; and Townsend's Appeal has no writ history.

The remaining question posed is this: Of whether the Authority, having thus legally acquired the project tract, is empowered to sell any part thereof when no longer needed for its public purpose. We arrive at an affirmative answer, though after considerable study. It is a general principle of law that the Legislature cannot authorize the taking of property in excess of that required for the public use, such excess to be sold or devoted to private use. "But, where a fee simple is taken, the weight of authority is that there is no reversion, but, when the particular use ceases, the property may be disposed of for either public or private uses. But some courts hold that where a fee is taken for a particular public purpose, the land will revert when the use for that purpose is abandoned." Lewis, Eminent Domain, 3rd Ed., p. 1500. " * * * Land which a public service corporation holds in fee and which is not necessary for the public use may, however, lawfully be sold to private purchasers; the same rule would doubtless apply to the entire location if the public use had been lawfully abandoned. * * *." 18 Am.Jur., Eminent Domain, p. 749. "Where land is taken in fee simple absolute, the condemnor may sell it irrespective of the use to which the purchaser may intend to put it; where a fee is acquired subject to a trust to use the property for a particular purpose, the condemnor is not entitled to sell the land, unless by statute authorized to do so. * * *." 30 C.J.S., Eminent Domain, § 454, p. 215. In the often cited case of Chamberlain v. North-

eastern R. Co., 41 S.C. 399, 19 S.E. 743, 745, 996, 25 L.R.A. 139, is a quotation from Waterman on Corporations, viz.: "'So, where a purchase of real estate has been lawfully made by a corporation, the purchase does not cease to be legal, or the corporation cease to have a right to hold or convey the property thus acquired, merely because the object which induced the purchase has been accomplished, or no longer affords an inducement to retain it. Corporations, although limited in their own duration of life, may purchase and hold and convey, and they may sell such real estate whenever they find it no longer necessary.'"

In Moore v. City of Beaumont, Tex. Civ.App., 195 S.W.2d 968, 977, affirmed 146 Tex. 46, 202 S.W.2d 448, the question was as to validity of a deed given by the City conveying a royalty interest under the municipal airport, it having acquired a fee simple title to the site. The Beaumont Court affirmed the sale, holding in part: "The City acquired the land from Evelyn R. Poole, et al. for the purpose of establishing an airport thereon. Moore alleges, in effect, that this land was paid for with proceeds of bonds which had been voted and issued for the purpose of acquiring an airport. Therefore, during such a period of time as the city council of the city of Beaumont deemed it proper to use this land for an airport, the land was, in a sense, dedicated to that purpose to this extent, namely, that until the city council lawfully determined to abandon the land for use as an airport, the City could not use the land for any other purpose which, as a matter of fact, would interfere with use of the land for an airport. City of Beaumont v. Matthew Cartwright Land & Improvement Co., Tex.Civ.App., 224 S.W. 589; Moore v. Gordon, Tex.Civ.App., 122 S.W.2d 239. However, it is recognized in both decisions that the City need not always use the land for the purpose for which it was originally acquired; it is held in each that the particular use can be abandoned. We hold further that the exercise of the City's power to abandon a use of land is not limited to the tract as a whole; the City must be allowed

to exercise this power in a practical way, according to the circumstances which may arise; and *if the City discovers that all of the land is not needed for the purpose for which the land was acquired, then the City need not continue to use all of the land for that purpose. That part of the land which is not needed can be sold;* it was so held in Sayles v. City of Abilene, Tex.Civ.App., 290 S.W. 239, affirmed Tex.Com.App., 295 S.W. 578." (Emphasis ours.) In Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834, 843, it was held: "* * Nor can valid objection be made to the permission given the Housing Authorities to acquire, when exercising the power of eminent domain, an absolute or fee simple title, and to sell and convey any property, even if thus acquired, when it determines that it is no longer needed for the purposes of the act. * * *" In Brazos River Conservation & Reclamation District v. Harmon, supra [178 S.W.2d 291], the statement is made: "In arriving at the foregoing conclusions denying the District's right or authority to acquire additional and contiguous lands for private purposes, it must be borne in mind that *the case in hand is not one involving the right or authority of the District to sell or lease a part of its acreage theretofore acquired on the basis of 'necessity or convenience,'* or by any other *legitimate method,* but the instant case is one where the right to condemn is raised and challenged in the outset by the owner of the property and the jury has convicted the District of attempting to take the 'excess acreage' for the main or primary purpose of subletting to individuals for profit, etc. *This last circumstance renders inapplicable those authorities upholding a condemnor's right to make certain uses or disposition of property already acquired in some authorized manner."* (Emphasis ours.)

Appellee Authority in the alternative pleads that if, in law, it is not vested with power to make sale of the lands in question, then it desires to exercise its right under Art. 1269k of adapting said land to parks, playgrounds, administration buildings, community facilities, or of holding same for

construction and development of additional housing for persons of low income. Of course, the Authority in any event is entitled to put the acreage to either of such uses.

However, for reasons hereinabove stated, appellants' point of appeal is overruled and judgment of the trial court is affirmed.

### On Motion for Rehearing

 Appellants strongly argue that in our consideration of their major point we failed to make appropriate use of the settled rule that in determining the propriety of a directed verdict, the evidence must be viewed in the light most favorable to the losing party. However, not to be overlooked in application of this principle, is the distinction between cases cited by them and those cases which relate to the exercise of judgment and discretion by a duly constituted administrative agency of the State. Here, defendant Commissioners, having been granted by statute the power of eminent domain, there is at once removed from the jury's function the power to pass upon the *necessity* of acquiring a particular piece of property in the exercise of that power. As stated in Housing Authority of City of Dallas v. Higginbotham, supra, this determination of necessity is conclusive in absence of fraud, and appellants point to no evidence in the record of fraudulent action. As constituting evidence of arbitrary and capricious action, appellants present their version of particular testimony (the Housing Commissioners, Director Stephenson, and Exhibits) which has again been given careful reading.

Regardless of whether the court or jury might consider these Commissioners to have acted unwisely or mistakenly in their fixing of the particular project boundaries at 513 acres, we again find nothing in this record raising issues of arbitrary or capricious conduct under the cited rule of Webb v. Dameron, supra. See also City of University Park v. Hoblitzelle, Tex.Civ. App., 150 S.W.2d 169; Lone Star Gas Co. v. State, 137 Tex. 279, 153 S.W.2d 681; Driskell v. Board of Adjustment, Tex.Civ.

App., 195 S.W.2d 594; Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W. 2d 420; Edge v. City of Bellaire, Tex. Civ.App., 200 S.W.2d 224; Jones v. Marsh, 148 Tex. 362, 224 S.W.2d 198; Patillo v. County School Trustees, Tex.Civ.App., 235 S.W.2d 924.

Counsel correctly states that in contrast with the situation in Townsend's appeal, the Hoffman and Foy deeds contained the additional clause: "this conveyance is given in confirmation of the condemnation proceedings now pending, and the award of the Commissioners made therein which award is accepted by the grantors herein"; deed to Hampton Gardens lots being in settlement of threatened condemnation proceedings.

The entire record has been re-examined along with appellants' argument on rehearing, but the motion therefor must be overruled.