In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-09-002-CV


____________________



TEXAS RICE LAND PARTNERS, LTD., 


and MIKE LATTA, Appellants



V.



DENBURY GREEN PIPELINE-TEXAS LLC, Appellee






On Appeal from the 172nd District Court


Jefferson County, Texas


Trial Cause No. E-181,923






OPINION


 This is an appeal from a final summary judgment granting Denbury Green Pipeline-Texas LLC ("Denbury Green") a permanent injunction against appellants, Texas Rice Land
Partners, Ltd. and Mike Latta (collectively "Texas Rice"). After Texas Rice repeatedly
refused to allow Denbury Green to enter the subject property to conduct surveys for the
location and placement of a carbon dioxide pipeline, Denbury Green filed an Original
Petition for Temporary Restraining Order and for Temporary and Permanent Injunction to
prevent Texas Rice from interfering with Denbury Green's alleged right to enter the property
as a common carrier. After the presentation of evidence and argument by both parties, the
trial court granted Denbury Green's request for temporary injunction. Thereafter, the parties
filed cross motions for summary judgment. The trial court entered judgment for Denbury
Green permanently restraining Texas Rice from interfering with Denbury Green's survey
rights. 

 The trial court found that Denbury Green proved as a matter of law that Denbury
Green "is a common carrier pursuant to Section 111.002(6) of the Texas Natural Resources
Code," and has "the power of eminent domain/authority to condemn/right- to-take pursuant
to Section 111.019 of the Texas Natural Resources Code." The trial court further
permanently enjoined Texas Rice and its tenant, Mike Latta, from interfering or attempting
to interfere with Denbury Green's right to enter and survey the route along which Denbury
Green's proposed pipeline would follow across Texas Rice's land. (1) 

 Texas Rice appeals the trial court's judgment. In two issues, Texas Rice contends that
the trial court erred in granting the motion for summary judgment in favor of Denbury Green
and in denying summary judgment for Texas Rice. Because we find that Denbury Green
established its common carrier status as a matter of law, such finding is dispositive of both
issues on appeal and, therefore we affirm the judgment of the court below.

STANDARD OF REVIEW


 Appellate courts review a trial court's grant of a traditional motion for summary
judgment de novo. Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex.
2003). To prevail on a traditional motion for summary judgment, the movant must establish
that there is no genuine issue of material fact so that the movant is entitled to judgment as a
matter of law. Tex. R. Civ. P. 166a(c); W. Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex.
2005). We must determine whether the movant carried its burden to establish that there
existed no genuine issue of material fact and that it was entitled to judgment as a matter of
law. Shah v. Moss, 67 S.W.3d 836, 842 (Tex. 2001). We assume all evidence favorable to
the nonmovant is true, indulge every reasonable inference in favor of the nonmovant, and
resolve any doubts in his favor. IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,
143 S.W.3d 794, 798 (Tex. 2004). "A plaintiff moving for summary judgment must prove
that it is entitled to summary judgment as a matter of law on each element of its cause of
action." Winchek v. Am. Express Travel Related Servs. Co., 232 S.W.3d 197, 201 (Tex.
App.--Houston [1st Dist.] 2007, no pet.). Once the movant conclusively establishes its cause
of action, the burden shifts to the nonmovant to respond with evidence raising a genuine
issue of material fact that would preclude summary judgment. See Rhone-Poulenc, Inc. v.
Steel, 997 S.W.2d 217, 222-23 (Tex. 1999). 

COMMON CARRIER STATUS


 The Texas Natural Resources Code provides, in pertinent part:

 A person is a common carrier subject to the provisions of this chapter if it:

 . . . .

 (6) owns, operates, or manages, wholly or partially, pipelines for the
transportation of carbon dioxide or hydrogen in whatever form to or for the
public for hire, but only if such person files with the commission a written
acceptance of the provisions of this chapter expressly agreeing that, in
consideration of the rights acquired, it becomes a common carrier subject to
the duties and obligations conferred or imposed by this chapter[.]


Tex. Nat. Res. Code Ann. § 111.002(6) (Vernon Supp. 2008). Common carriers in Texas
have the right and power of eminent domain. Id. § 111.019(a) (Vernon 2001). "In the
exercise of the power of eminent domain . . . , a common carrier may enter on and condemn
the land . . . of any person or corporation [when] necessary for the construction, maintenance,
or operation of the common carrier pipeline." Id. § 111.019(b).

 Whether a pipeline company is a common carrier is a question of law. See Vardeman
v. Mustang Pipeline Co., 51 S.W.3d 308, 312 (Tex. App.--Tyler 2001, pet. denied). 
Moreover, in making that determination, the courts must give great weight to determinations
made by the Texas Railroad Commission ("TRC"). See id. (citing State v. Public Util.
Comm'n of Tex., 883 S.W.2d 190, 196 (Tex. 1994)). The Vardeman court explained:

 The authority of a pipeline company to condemn property is to be
determined as a matter of law by the trial court. However, when determining
whether [a pipeline company] is a common carrier under section 111.002(6)
of the Texas Natural Resources Code, we have been instructed by the supreme
court to give great weight to the TRC's determination of that issue. When the
evidence before the court indicates that a pipeline . . . has subjected itself to the
authority of the TRC to regulate its activities, then it is a common carrier.


Id. at 312-13 (citations omitted). 

 In Vardeman, Mustang Pipeline Company attached as evidence a letter from the TRC,
which stated as follows:

 A review of Commission records indicates that Mustang has met the
requirements of § 111.02(6) of the Texas Natural Resources Code for common
carrier status. First, Mustang has subjected itself to the jurisdiction of the
Commission by declaring on its T-4 application for permit to operate a pipeline
that it is a common carrier. Second, Mustang has held itself out to the public
for hire as evidenced by its Texas Local Tariff No. M-3 on file with the
Commission. Therefore, Mustang is a common carrier subject to the
jurisdiction of the Commission. 


Id. at 313. The court concluded that "[w]ith the letter, Mustang established in its motion for
summary judgment that it had subjected itself to the regulatory jurisdiction of the TRC." Id.
The court also found significant that Mustang attached deposition testimony of an authorized
Mustang representative, who testified that Mustang had filed a tariff with the TRC outlining
Mustang's public rates for transmitting ethylene. Id. The representative further testified that
there had been negotiations with companies other than Mustang's parent company to carry
products through the pipeline. Id. The court concluded that these facts supported both the
TRC's determination and Mustang's own contention that it was a common carrier. Id.

 Similarly, in Lohmann v. Gulf Ref. Co., 682 S.W.2d 612 (Tex. App.--Beaumont
1984, no pet.), we considered whether the trial court's finding in a bench trial that Gulf
Refining Company was a common carrier was supported by the evidence. Id. at 613-14. 
Gulf Refining had received permits from Jefferson County and the State of Texas to
construct and maintain a common carrier pipeline. Id. at 614. After the line was laid, Gulf
Refining applied for and received a common carrier pipeline permit from the TRC. Id. Gulf
Refining then published and distributed tariffs advising the public of the line's availability
and the rates charged. We determined, based on these facts, that the trial court's judgment
that Gulf Refining was a common carrier was supported by the evidence. Id. at 614-15. 

 Like the pipeline company in Vardeman, the summary judgment evidence in this case
shows that Denbury Green submitted itself to the jurisdiction of the TRC. On March 19,
2008, Denbury Green applied for a T-4 permit to operate a carbon dioxide pipeline as a
common carrier in the State of Texas. On March 25, 2008, pursuant to section 111.002(6),
Denbury Green filed with the TRC its written acceptance of the provisions of Chapter 111
of the Texas Natural Resources Code and expressly agreed that it was a common carrier, and
that it was subject to the duties and obligations conferred or imposed by Chapter 111. On
April 2, 2008, the TRC issued a T-4 permit to Denbury Green. On July 11, 2008, the Gas
Services Division of the TRC declared Denbury Green to be a common carrier for purposes
of transporting carbon dioxide in the State of Texas. The letter from the TRC stated as
follows:

 This letter is to confirm the fact that Denbury Green Pipeline-Texas
LLC has been granted a permit to operate a pipeline . . . and has made all of
the currently necessary filings to be classified as a common carrier pipeline for
transportation of carbon dioxide under the provisions of Texas Natural
Resources Code § 111.002(6) and as otherwise required by the Railroad
Commission. 


Further, on November 7, 2008, Denbury Green filed its tariff with the TRC. Additionally,
the record includes an affidavit from Ray Dubuisson, Denbury Green's Vice President of
Land. Dubuisson states that "Denbury Green is currently negotiating with other entities to
transport anthropogenic carbon dioxide once the construction of the pipeline is complete." 
Additionally, in his deposition Dubuisson acknowledged that Denbury Green may transport
other entities' carbon dioxide, "from anywhere near the pipeline." These facts support
Denbury Green's contention that it is a common carrier.

 Texas Rice argues that a genuine issue of material fact exists as to whether Denbury
Green is a common carrier, asserting that Denbury Green's pipeline is actually a private line
as opposed to a pipeline to transport to or for the public for hire. Texas Rice relies upon the
holding in China-Nome Gas Co. v. Riddle, 541 S.W.2d 905 (Tex. Civ. App.--Waco 1976,
writ ref'd n.r.e.), to support its contention that Denbury Green's pipeline is a private line to
be used for private purposes. 

 China-Nome involved an interlocutory appeal of a temporary injunction entered by
the trial court to halt China-Nome, an oil and gas company, from further construction or use
of a gas transmission pipeline being laid on property that had not been acquired through
easement or condemnation, and did not include a motion for summary judgment. The narrow
issue presented to the Waco Court of Appeals was whether the trial court clearly abused its
discretion in ordering the temporary injunction. The court concluded that from the record
presented in that case, while there was evidence that China-Nome was a common carrier, the
record did not conclusively establish that fact. However, China-Nome is factually
distinguishable from the case at issue. Unlike China-Nome, before Denbury Green
commenced construction of its pipeline, it applied for and was granted a permit to operate
its carbon dioxide pipeline as a common carrier and had a tariff on file with the TRC, and
Denbury Green contends it fully complied with the requirements of the Texas Natural
Resources Code to conclusively prove it is a common carrier. Texas Rice had not presented
any evidence that Denbury Green had not met the statutory requirements under the Texas
Natural Resources Code to be authorized by the TRC as a common carrier. Instead, Texas
Rice argues that, despite Denbury Green's filings with the TRC, there is no evidence that
Denbury Green will operate the pipeline as a common carrier but, in fact, the pipeline will
be used solely for private purposes. 

 We find China-Nome inapplicable to the facts of the present case. See Vardeman, 51
S.W.3d at 313 (distinguishing China-Nome). Because Denbury's Green's pipeline was not
completed or operational at the time Texas Rice filed this lawsuit, there is no evidence in the
record regarding Denbury's Green's actual use of the pipeline. Even if there was such
evidence in the record, when determining public use, the existence of the public's right to use
the pipeline controls over the extent to which that right is, or may be, exercised. See
Tenngasco Gas Gathering Co. v. Fischer, 653 S.W.2d 469, 475 (Tex. App.--Corpus Christi
1983, writ. ref'd n.r.e.). "Texas courts have made it clear that it is the character of the right
which inures to the public, not the extent to which the right is exercised, that is important in
evaluating enterprises which are involved in condemning private property." Id. (citations
omitted). 

 "It is immaterial if the use is limited to the citizens of a local neighborhood, or
that the number of citizens likely to avail themselves of it is inconsiderable, so
long as it is open to all who choose to avail themselves of it. The mere fact
that the advantage of the use inures to a particular individual or enterprise, or
group thereof, will not deprive it of its public character."


Housing Auth. of the City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 84
(1940) (quoting West v. Whitehead, 238 S.W. 976, 978 (Tex. Civ. App.--San Antonio 1922,
writ ref'd)). Unlike the pipeline company in China-Nome, which sought a common carrier
permit after being in operation for many years, Denbury Green's pipeline will be available
for public use from the outset of its operation. See generally Vardeman, 51 S.W.3d at 314
("[T]he same facts which established that Mustang was a common carrier also established
that the proposed use of Mustang's pipeline was for a public purpose."). 

 We conclude Denbury Green established its common carrier status as a matter of law. 
We overrule issue one. Because we overrule issue one, we overrule issue two and affirm the
judgment of the court below.

 AFFIRMED. 

 
 __________________________________

 CHARLES KREGER

 Justice


Submitted on June 11, 2009

Opinion Delivered September 24, 2009


Before McKeithen, C.J., Gaultney and Kreger, JJ.

















Dissenting Opinion


 Genuine issues of material fact preclude summary judgment in this case. Denbury
Resources, Inc. describes the oil production purpose of its "Green Pipeline" on its web page,
a paper copy of which is in the record, as follows: 

 Our tertiary operations are our core assets and our principal focus. . . . During
the last eight years, we have learned an extensive amount about tertiary
operations and working with carbon dioxide ("CO2"), and our knowledge
continues to grow. We like these tertiary operations because (i) tertiary
investments provide a reasonable rate of return, even at relatively low oil
prices of around $30 per barrel, (ii) tertiary flooding exhibits a lower risk
profile than conventional exploration and development, and (iii) to date, in our
region of the United States, we have not encountered any industry competition. 
Generally, from the Texas Gulf Coast to Florida, there are no known
significant natural sources of carbon dioxide except our own, and these large
volumes of CO2 are the foundation for our entire tertiary program.

 . . . .


 We believe that having sufficient CO2 volumes is the key ingredient, if not the
most important factor to our tertiary operations. We acquired our Jackson
Dome (CO2) source field in February 2001, giving us control of most of the
CO2 supply in Mississippi . . . .

 . . . .

 

 We have entered into three agreements, and are having various levels of
discussions with many others, to purchase (if the plants are built) all of the
CO2 production from man-made (anthropogenic) sources of CO2 from
planned solid carbon gasification projects. . . .

 . . . .

 

 We see these sources as a possible expansion of our natural Jackson Dome
source, assuming they are economical, and we believe that our potential ability
to tie these sources together with pipelines will give us a significant advantage
over our competitors, in our geographic area, in acquiring additional oil fields
and these future potential man-made sources of CO2.

 . . . . 

 

 We are also working on a 24" pipeline, named the Green Pipeline, to transport
CO2 to Hastings Field and our 2007 Southeast Texas acquisitions, Oyster
Bayou, Fig Ridge and Gillock Fields. . . . Initially, we anticipate transporting
CO2 from our natural source at Jackson Dome in this line, but ultimately we
expect that it will be used to ship predominately man-made (anthropogenic)
sources of CO2.

 . . . .


 During November 2006, we acquired an option to purchase, on September 1,
2008, or September 1, 2009, with an effective date of January 1 of the
following year, Hastings Field, a strategically significant potential tertiary
flood candidate located near Houston, Texas. 

 . . . .

 

 We believe that Hastings Field possesses . . . potential from CO2 tertiary
floods, more reserve potential than any other single field in our inventory. 
Currently, we are working on the right-of-ways required to build a pipeline we
have named our Green Pipeline to transport CO2 to this field. . . . The
Hastings Field was the first significant strategic addition in this area, giving us
an anchor field in this region. We have already expanded our field inventory
in this area as we purchased Oyster Bayou and Fig Ridge Fields with tertiary
potential for $42 million in March 2007 and other small fields, Gillock Fields
near Hastings Field, in late 2007. . . . [O]ur goal is to continue to pursue the
acquisition of other fields in this area, which will help reduce the cost of CO2
for each field by fully utilizing the proposed pipeline and thereby reducing our
transportation cost per Mcf.


This declaration is some evidence Denbury intends to fully utilize the Green Pipeline as an
essential part of its tertiary oil production operations. Denbury's description of the pipeline's
purpose indicates the CO2 it transports in the pipeline will be its own, whether purchased
from man-made sources or supplied by its own Jackson Dome natural source. How then does
Denbury Green have the power to take the private property of another to accomplish this
purpose? 

 Denbury relies on Chapter 111 of the Natural Resources Code as a grant of eminent
domain. Eminent domain is the power to take private property for public use, and is
essentially a right of the state to reassert its control over property for the public good. See
generally Tex. Const. art. I, § 17. The Texas Constitution limits the power of eminent
domain. See id. The Constitution "prohibits the taking of property for private use." Maher
v. Lasater, 354 S.W.2d 923, 924 (Tex. 1962). In Maher, the Texas Supreme Court held: 

 The provision operates as a limitation on the power of the Legislature as well
as a limitation on the power of governmental agencies and public and private
corporations. (citation omitted). The Legislature may not authorize that which
the Constitution prohibits. . . . 


 [A] mere declaration by the Legislature cannot change a private use or private
purpose into a public use or public purpose. (citations omitted). While a
legislative declaration in this and kindred fields will be given great weight by
the courts, the ultimate question of whether a particular use is a public use is
a judicial question to be decided by the courts.

 

Id. at 924-25. In construing the statute, we presume the Legislature intended to comply with
the Constitution. See Tex. Gov't Code Ann. § 311.021(1) (Vernon 2005). 

 Consistent with the Texas Constitution, Chapter 111 of the Natural Resources Code 
is not applicable to pipelines used solely for private purpose. See Tex. Nat. Res. Code Ann.
§ 111.003 (Vernon 2001). Section 111.003 (a) states, "The provisions of this chapter do not
apply to pipelines that are limited in their use to the wells, stations, plants, and refineries of
the owner and that are not a part of the pipeline transportation system of a common carrier
as defined in Section 111.002 of this code." Id. Section 111.002(6) defines a CO2 pipeline
owner as a common carrier only if the owner, among other things, transports CO2 "to or for
the public for hire[.]" Tex. Nat. Res. Code Ann. § 111.002(6) (Vernon Supp. 2008). 

 Denbury argues that by agreeing to be regulated by the Commission it automatically
became a common carrier. The Constitution does not authorize the taking of private property
for regulated private use. Tex. Const. art. I, § 17. The use must be a public one. Id. 

 Denbury argues further that it must now by law permit others to use its pipeline. 
Merely offering a transportation service for a profit does not distinguish a private use from
a public use. Private carriers transport in particular instances for those they choose to
contract with, and make individualized decisions whether and on what terms to transport. 
A common carrier is one involved in a quasi-public activity, and transportation is, in fact,
available to all indifferently. Is the intent to make a pipeline running from a Denbury well
to a Denbury well available for use by the "public for hire" reasonable? This summary
judgment record is not entirely clear on that question. 

 We should not grant conclusive effect to Denbury's filings with the Railroad
Commission. The Commission's letter simply states that Denbury has made the necessary
filings to operate as a common carrier. Declaring a use public or private is a judicial
decision. See Maher, 354 S.W.2d at 925. We must give great weight to the declarations of
the Legislature and the Railroad Commission, but we should not assume either the
Legislature or the Railroad Commission intended to authorize an unconstitutional private
taking. We should presume that a constitutional declaration was intended. 

 Summary judgments are used to dispose of "patently unmeritorious claims. . . ." City
of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 n.5 (Tex. 1979). When there
is only a question of law involved and no genuine issue of material fact exists, a conventional
trial before a fact-finder may not be necessary. Here, however, genuine issues of material
fact exist. We should reverse the summary judgment and remand the case for a trial at which
the disputed facts can be determined by a fact-finder. If Denbury is successful at trial, then
it can proceed with the exercise of eminent domain powers, and appellant should be enjoined
from interfering. Otherwise, the Texas Constitution prohibits an attempt to take private
property without the owner's consent. I respectfully dissent. 

 

 ____________________________

 DAVID GAULTNEY

 Justice


Dissent delivered

September 24, 2009
1. Texas Rice was further enjoined from harassing Denbury Green or any of its agents,
servants, representatives, employees, or any independent contractors with whom Denbury
Green has contracted while upon Texas Rice's land conducting such surveys.